SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.
OPINION
JUSTICE WECHT
*219 In these consolidated cases, we granted allowance of appeal to determine whether and to what extent a hospital and a health care staffing agency have a legal duty to prevent a terminated employee from causing harm to patients at another health care facility.
Plaintiffs claim that David Kwiatkowski, a radiology technician formerly employed at UPMC Presbyterian Hospital ("UPMC"), who was placed there by staffing agency Maxim Healthcare Services, Inc. ("Maxim"), engaged in the diversion and substitution of intravenous fentanyl. Specifically, Kwiatkowski injected himself with fentanyl from a preloaded syringe, refilled the syringe with saline or another substance, and then replaced the now-contaminated syringe where it could be used by others to inject patients. In doing so years later at a Kansas hospital, Kwiatkowski allegedly communicated hepatitis C to Plaintiffs, who were patients at that hospital.
Pursuant to federal regulation, UPMC (but not Maxim) indisputably had a legal obligation to report the diversion of controlled substances to the United States Department of Justice's Drug Enforcement Administration ("DEA"). UPMC failed to do so. The Superior Court determined that Plaintiffs established that both UPMC and Maxim (collectively, "Defendants")[1] had a duty to report Kwiatkowski's misconduct to the DEA and to "law enforcement," and that Defendants' failure to do so could provide a basis for negligence claims. See Walters v. UPMC Presbyterian Shadyside , 144 A.3d 104 (Pa. Super. 2016). We affirm the Superior Court's ruling with respect to UPMC (albeit with a modest caveat), and we reverse the Superior Court's ruling to the extent it imposed the same duty upon Maxim.
I. Background and Procedural History[2]
From March 2008 to May 2008, Kwiatkowski was on staff at UPMC, but employed by Maxim. On May 7, 2008, a *220 hospital staff member saw Kwiatkowski walk into an operating room, select a syringe, place it inside his clothing, and leave. UPMC later determined that a syringe containing fentanyl, a Schedule II controlled substance,[3] was missing and had been replaced with a syringe containing another liquid. UPMC personnel confronted Kwiatkowski, and found on his person three empty fentanyl syringes. They then searched his locker, and found a syringe labeled as morphine.[4] Kwiatkowski's urine tested positive for fentanyl and opiates. UPMC immediately barred Kwiatkowski from working at the hospital. However, UPMC failed to report the diversion to the DEA,[5] despite its obligation to do so pursuant to regulations promulgated under the Comprehensive Controlled Substances Act of 1970 ("CSA" or "Act").[6]
From May 2008 to April 2010, Kwiatkowski worked at seven different hospitals in three states. In May 2010, he was placed by a staffing agency at Hays Medical Center in Hays, Kansas. Plaintiffs were patients at Hays Medical Center during Kwiatkowski's tenure. They were administered medication through a syringe that Kwiatkowski had used to inject himself, had refilled with saline, and then had replaced where it would be reused. Plaintiffs later tested positive for the same strain of hepatitis C carried by Kwiatkowski.
Kwiatkowski's ongoing misconduct did not end in Kansas. In 2012, after his employment at Exeter Hospital in New Hampshire, the New Hampshire Department of Health announced that more than thirty patients at that hospital who had been treated in the department where Kwiatkowski then worked had tested positive for hepatitis C. Thereafter, many patients whose paths had crossed Kwiatkowski's at various hospitals were urged to be tested for hepatitis C. On July 19, 2012, the United States District Court for the District of New Hampshire issued an arrest warrant for Kwiatkowski, based upon violations of 21 U.S.C. § 843(a)(3) ("acquir[ing] or obtain[ing] possession of a controlled substance by misrepresentation, *221 fraud, forgery, deception, or subterfuge") and 18 U.S.C. § 1365(a)(3) (tampering with any consumer product that affects interstate or foreign commerce, or its container or label, with reckless disregard for creating a risk of death or bodily injury to another, when serious bodily injury resulted). In 2013, Kwiatkowski pleaded guilty to numerous federal charges, and was sentenced to thirty-nine years in prison.
In 2012, Plaintiffs commenced this action, asserting claims for negligence against UPMC and Maxim and negligence per se against UPMC, as well as related claims for vicarious liability, punitive damages, and loss of consortium.[7] UPMC and Maxim filed preliminary objections in the nature of demurrers. The trial court, finding that Defendants owed no legal duty to Plaintiffs, sustained the objections and dismissed Plaintiffs' claims. The trial court determined that, to impose such a duty would expose Defendants and others similarly situated to liability unbounded by geography or time, and that, as a matter of sound policy, these consequences outweighed the social benefits of imposing such a duty.
Plaintiffs appealed the trial court's order to the Superior Court, challenging only the dismissal of their negligence claims against both Defendants, effectively abandoning their negligence per se claim against UPMC. Applying the multifactorial test set forth in Althaus ex rel. Althaus v. Cohen , 562 Pa. 547, 756 A.2d 1166 (2000), the Superior Court reversed the trial court as to both Defendants. The Superior Court concluded that Defendants' relationship with Kwiatkowski, their knowledge of the conduct that led to his dismissal, their legal obligation to report such diversions, and the foreseeable risk of grievous, widespread harm associated with the continuation of such conduct elsewhere, all weighed in favor of imposing a legal duty to protect third parties from Kwiatkowski's misconduct. In the Superior Court's view, Plaintiffs pleaded "facts that would support imposition of a common[-]law duty of care upon UPMC and Maxim to report Kwiatkowski's criminal conduct to the DEA and/or other law enforcement agencies for prosecution." Walters , 144 A.3d at 121.
II. Discussion
A. Common-Law Duty
Negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." Martin v. Evans , 551 Pa. 496, 711 A.2d 458, 462 (1998). "While the existence of a duty is a question of law, whether there has been a neglect of such duty is generally for the jury." Emerich v. Phila. Ctr. for Human Dev., Inc. , 554 Pa. 209, 720 A.2d 1032, 1044 (1998). "[T]he plaintiff has the burden of establishing, by a preponderance of the evidence, that the defendant engaged in conduct that deviated from the general standard of care expected under the circumstances, and that this deviation proximately caused actual harm." Martin , 711 A.2d at 462. To establish a prima facie case of negligence, a plaintiff must plead that "the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." Id. at 461. The only issue before this Court today is the question of duty.[8]
*222 "The determination whether to impose affirmative common-law duties as a predicate to civil liability is a matter of law; accordingly, our review is plenary." Seebold v. Prison Health Servs., Inc. , 618 Pa. 632, 57 A.3d 1232, 1243 (2012) ; see Thierfelder v. Wolfert , 617 Pa. 295, 52 A.3d 1251, 1264 (2012). We have characterized the duty inquiry as the "primary" inquiry in negligence. Phillips v. Cricket Lighters , 576 Pa. 644, 841 A.2d 1000, 1008 (2003). To assist us in identifying a previously unrecognized duty, we rely upon five factors: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." Althaus , 756 A.2d at 1169.[9]
Although our Althaus analysis applies principles well-rooted in the common law, we long have recognized that determining whether to impose a duty of care in novel circumstances can prove difficult, requiring policy judgments generally reserved for legislative action. In Althaus , and in several other cases, we have quoted *223 Dean William Prosser's influential comments:
These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make of it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question.... The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, "always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind[," Palsgraf v. Long Island R. Co. , 248 N.Y. 339, 162 N.E. 99, 104 (N.Y. 1928) (Andrews, J., dissenting) ].
Althaus , 756 A.2d at 1169 (quoting Sinn v. Burd , 486 Pa. 146, 404 A.2d 672, 681 (1979) (quoting William L. Prosser, Palsgraf Revisited , 52 MICH. L. REV. 1, 15 (1953) ) ).[10] Thus, determining whether to impose a duty often requires us to weigh "amorphous public policy considerations, which may include our perception of history, morals, justice and society." Althaus , 756 A.2d at 1169 (citing Gardner v. Consol. R. Corp. , 524 Pa. 445, 573 A.2d 1016, 1020 (1990) ).
Our concern for the hazards of judicial policy-making has prompted our continuing restraint.
[T]he adjudicatory process does not translate readily into the field of broad-scale policymaking. Seebold , 57 A.3d at 1245.... For this reason, and because the Legislature possesses superior policymaking tools and resources and serves as the political branch, we took the position in Seebold that we would not direct the substantive common law away from well-established general norms in the absence of some clear predominance of policy justifications. See id. (citing Cafazzo v. Cent. Med. Health Servs., Inc. , [542 Pa. 526] 668 A.2d 521, 537 (Pa. 1995), for the proposition that, "[b]efore a change in the law is made, a court, if it is to act responsibly must be able to see with reasonable clarity the results of its decision and to say with reasonable certainty that the change will serve the best interests of society" (citation omitted) ).
Lance v. Wyeth , 624 Pa. 231, 85 A.3d 434, 454 (2014) (citations modified; footnote omitted). Mindful of our long-standing caution, we turn now to review three cases that preceded Althaus , Althaus itself, and then several cases that followed. Most of these precedents have been considered in this case by the lower courts and addressed in arguments of the parties.
In DiMarco v. Lynch Homes-Chester County , 525 Pa. 558, 583 A.2d 422 (1990), this Court considered "whether a physician owes a duty of care to a third party where the physician fails to properly advise a patient who has been exposed to a communicable disease, and the patient, relying upon the advice, spreads the disease to a third party." Id. at 423. In that case, a technician stuck herself with a needle she had used to draw blood from an individual infected with hepatitis. The physicians she consulted indicated that, if she remained symptom-free for six weeks, she could be *224 confident that she had not contracted hepatitis. Although the physicians did not specifically direct her to abstain from sexual activity during that period, the technician did so for eight weeks, during which she remained asymptomatic. Thereafter, she had sex with the plaintiff. Both later learned that they were infected, and plaintiff sued the physicians and others for negligence and related claims.
Applying the Restatement (Second) of Torts § 324A ("Liability to Third Person for Negligent Performance of Undertaking"), we noted that, for the patient to state a claim, the defendant-physicians must have undertaken "to render services to another which [they] should recognize as necessary for the protection of a third person," a principle we characterized as "essentially a requirement of foreseeability." DiMarco , 583 A.2d at 424 (quoting Cantwell v. Allegheny Cty. , 506 Pa. 35, 483 A.2d 1350, 1353-54 (1984) ). We underscored the obligation of a physician to give sound advice, and observed that, the patient's health already having been compromised, providing advice regarding contagion serves solely to protect the health of others. Id. at 425. Accordingly, a physician's duty extends to those "within the foreseeable orbit of risk of harm." Id. (quoting Doyle v. S. Pittsburgh Water Co. , 414 Pa. 199, 199 A.2d 875, 878 (1964) ). Thus, a third person within that "orbit" could state a cause of action against a physician who neglected that duty. See Troxel v. A.I. DuPont Institute , 450 Pa.Super. 71, 675 A.2d 314, 322-24 (1996) (finding a duty to inform a patient to avoid contact with pregnant women because the patient's contagious disease presented potentially lethal health risks to fetuses).
In Emerich , 720 A.2d 1032, this Court held that a mental health counselor had a duty to protect a woman from her ex-boyfriend when he threatened during a counseling session to harm her. The patient in question, Gad Joseph, was diagnosed with various disorders and substance abuse problems, and had a history of threatening his ex-girlfriend, Teresa Hausler. After Hausler ended their relationship and moved in with another man, Joseph called his counselor and suggested that he was going to kill Hausler. The counselor summoned Joseph for an emergency session, during which Joseph indicated that Hausler intended to return that day to their formerly-shared residence to collect her things, and that he would kill her if she did so. The counselor recommended that Joseph voluntarily commit himself, but Joseph claimed that he had regained control. The counselor then permitted Joseph to leave. Hausler later contacted the counselor, who urged her not to go to the apartment. Hausler disregarded the counselor's warning and continued to the residence, where Joseph shot and killed her.
Based upon these facts, Emerich (as administrator of Hausler's estate) filed suit alleging that the counselor had, and failed to discharge, a duty to take adequate steps to protect Hausler. The trial court found that no such duty existed in Pennsylvania, and that, even if such a duty existed, the counselor satisfied it when he warned Hausler. The Superior Court affirmed on the same bases.
On appeal, this Court held "that a mental health care professional, under certain limited circumstances, owes a duty to warn a third party of threats of harm against that third party." Id. at 1036.[11] Acknowledging *225 the general common-law rule that there is no duty to control the conduct of a third party to protect another individual from harm, we noted that an exception exists "where a defendant stands in some special relationships with either the person whose conduct needs to be controlled or in a relationship with the intended victim of the conduct, which gives to the intended victim a right of protection." Id. (citing RESTATEMENT (SECOND) OF TORTS § 315 ).[12] The Court determined that a majority of courts in other jurisdictions had concluded that a mental health counselor has a special relationship with his patient that imposes an affirmative duty to protect an identified potential victim from harm. Citing DiMarco , the court further found "no reason why an analogous duty to warn should not be recognized when the disease of the patient is a mental illness that may pose a potentially greater and more immediate risk of severe harm or death to others." Id. at 1039. Finally, the Court assessed policies militating for and against such a duty, and found no benefit to concealment that would outweigh the benefit of imposing a duty to warn an intended victim.[13]
In Witthoeft v. Kiskaddon , 557 Pa. 340, 733 A.2d 623 (1999), a case that UPMC contends the Superior Court should have found controlling, see supra n.9, we considered ophthalmologist Dr. James Kiskaddon's duty to a cyclist when his patient, Helen Meyers, fatally struck that cyclist with her car. Although required to do so by regulation, Dr. Kiskaddon had failed to notify Meyers and the Pennsylvania Department of Transportation ("PennDOT") that Meyers' visual acuity had fallen below the legal threshold for licensure.
As in DiMarco , the plaintiff argued, the decedent fell within the scope of a foreseeable risk of harm as a consequence of Dr. Kiskaddon's failure to inform Meyers and PennDOT of Meyers' disability. This Court noted that DiMarco's focus was upon the communicable nature of the hepatitis, and indicated that "the threat of the spread of a communicable disease was paramount in the court's mind." Id. at 628 (citing Troxel , 675 A.2d 314 ). In such a circumstance, "the physician's duty to provide accurate information is critical, because information regarding the risks of cont[r]acting the disease or the dangers of transmitting the disease are often times not known to the general public." Id. However, in Witthoeft , "we [were] faced with poor vision, certainly not a communicable disorder or a disorder of imminent threat to health." Id. We held that this distinction vitiated the public health concerns that underlay our decision in DiMarco .
Further distinguishing DiMarco , we rejected the proposition that the harm in the *226 Witthoeft case was sufficiently foreseeable to support a duty under the circumstances:
It may be reasonably foreseeable that a patient exposed to an infectious and communicable disease will injure a third party unless properly informed to prevent the spread of the disease. However, we believe that it is an unreasonable extension of the concepts of duty and foreseeability to broaden a physician's duty to a patient and hold a physician liable to the public at large within the factual scenario of this case. This is especially true where, as here, [the doctor] did not cause or aggravate a medical condition that affected the patient's driving ....
[Plaintiff's] decedent is simply not a foreseeable victim that this [C]ourt will recognize. We will not stretch foreseeability beyond the point of recognition for to do so will be to make liability endless. To allow liability in this case would be to make physicians absolutely liable for the various acts of their patients. This we will not countenance.
Id. at 630.[14]
In Althaus , a counselor, based upon an adolescent patient's allegations that her father had touched her inappropriately, reported the father to Children and Youth Services. The patient then was removed from her family's home and subjected to a medical examination, which produced no evidence of sexual activity. A clinical psychologist interviewed the patient, and referred her to a psychiatrist who specialized in treating sexual abuse victims. During approximately one year of treatment with that specialist, the scope of the patient's increasingly lurid, improbable allegations expanded to include other family members, her father's coworkers, and strangers. These allegations precipitated a series of criminal proceedings against the alleged abusers. The patient's dubious allegations culminated in a hearing to determine her competency to testify at those criminal proceedings, where the specialist ultimately opined that the patient could not distinguish fact from fantasy. The court then dismissed the criminal charges against the father. The patient eventually recanted her allegations, and was reunited with her family.
The parents sued the specialist for medical malpractice, alleging that she had negligently treated their daughter, exacerbating her condition and subjecting them to the negative consequences associated with being accused of sexual abuse. A jury entered a verdict in the parents' favor, the Superior Court affirmed, and the specialist appealed, contesting her duty to communicate with parents in derogation of her professional duty of confidentiality to the patient.
After sounding our cautionary refrain regarding the risks of instantiating duties that are new to the common law, we debuted the above-mentioned five-factor rubric, by which we sought to give shape to considerations that had emerged as beneficial in prior cases implicating a novel common-law duty. See Althaus , 756 A.2d at 1169. With regard to the first factor, the relationship of the parties, this Court noted that the specialist played no role in the criminal investigation of the parents and *227 never testified against them. Moreover, the specialist's "professional relationship with [the patient did] not create the type of relationship between [the specialist and the parents] to support the imposition of a duty of care," and thus her "professional obligations and legal duties ... related exclusively to her patient." Id. at 1169-70. Next, acknowledging the need to prevent sexual abuse and the importance of psychological treatment, we found that social utility, the focus of the second factor, disfavored imposing a duty of care to non-patients, especially alleged abusers. In connection with the third factor, the Court recognized that substantial and foreseeable harm caused by a false accusation presented a countervailing concern in favor of a duty to protect third parties against false accusations, but noted that the patient's accusation against the parents had preceded treatment with the specialist, which weighed against imposing the duty in that case. With regard to the fourth factor, the consequences of imposing a duty, the Court emphasized that successful mental health counseling substantially depends upon trust, fostered by the promise of confidentiality, which would be compromised by obligating counselors to protect parties outside the therapeutic relationship. Thus, that consideration also weighed against the imposition of a duty. Fifth and finally, the Court found that the overarching public interest in preserving therapeutic confidentiality eclipsed any countervailing considerations. Accordingly, we declined to impose a duty upon the specialist.
After Witthoeft and Althaus , one might fairly conclude that our willingness to contemplate previously unrecognized duties of care had grown strikingly narrow.[15] Yet those decisions, like all of the decisions under review, necessarily hinged upon fine-grained assessments of public policy relative to the precise circumstances presented. See Phillips , 841 A.2d at 1008-1009 ("No one of [the Althaus ] factors is dispositive. Rather, a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant."). This was made clear in a series of cases that followed Althaus , in which we found that a third-party duty would lie.
In Sharpe v. St. Luke's Hospital , 573 Pa. 90, 821 A.2d 1215 (2003), for example, we imposed a duty associated with a hospital's drug-testing procedures because it was foreseeable that returning false positives to an employer who retained the hospital to test its employees would lead to adverse consequences for the tested employees. We based that decision upon a combination of common sense and the hospital's knowledge of why it had been retained to conduct such testing.
In Phillips , 841 A.2d 1000, we found it foreseeable that butane lighters would fall into the hands of children and that, absent child-safety features, children playing with lighters would set fires. There, while we recognized the societal benefit of furnishing *228 a "reliable, convenient method to create a flame," we detected no social utility in producing a lighter without a child safety feature. Id. at 1009. In considering the nature of the risk imposed and the foreseeability of harm, we found the risk of injury and property damage threatened by children playing with lighters substantial, citing evidence that children playing with lighters killed or injured nearly one thousand people per year and spawned costs measured in hundreds of millions of dollars. Furthermore, it was foreseeable that children would come into possession of lighters and that of these children some would start fires. The quantum of risk and the foreseeability of harm thus weighed in favor of imposing a duty. Ultimately, the nominal cost of adopting safety features paled before the strong public interest in avoiding the "catastrophic effects on human beings as well as property" caused by child-started fires, and thus it was in the public interest to impose a duty.[16]
In R.W. v. Manzek , 585 Pa. 335, 888 A.2d 740 (2005), claimants were the parents of a child who was brutally assaulted while attempting to sell candy to a stranger in connection with a school fundraiser. The parties raised numerous claims in state and federal court, among which was a state negligence claim against a company that specialized in facilitating school fundraisers, premised upon that defendant's duty to take steps to educate the children it assisted regarding the dangers inherent in fundraising. The plaintiffs principally relied upon the relationship and risk/foreseeability factors to establish the duty. The relationship, they maintained, stemmed from the fact that the victim had been recruited for the effort, that she had been enticed to sell to strangers by the promise of various incentives, and that the defendant benefited directly from her participation. Furthermore, "the harm that befell [her] ... fell within a general, broad class of risks which the [defendant's] fundraising activities foreseeably created." Id. at 747. We determined that the case hinged upon the question of foreseeability, and found the plaintiffs' averments sufficient to establish that the defendant "had actual or constructive knowledge of the dangers inherent in conducting school fundraising activities as prize[-]winning competitions and in encouraging elementary school students to approach strangers," and failed to warn the students or parents either verbally or in their written materials. Id. at 751. Thus, we held that the plaintiffs had set forth a claim upon which relief could be granted.
In Thierfelder , and shortly thereafter in Seebold , we returned to a more stringent account. In the former case, a physician engaged in a sexual relationship with a patient whom he was treating for anxiety and depression. During treatment, the patient called the doctor her hero, indicated that he had cured her problems, and shared her belief that she was in love with him, allegedly exhibiting signs of the "transference phenomenon," a process by which a patient displaces feelings she has for one individual in her life onto the therapist. The plaintiffs asserted medical malpractice and negligence based upon the physician's failure to recognize, and/or choice to exploit, her condition. We found that foreseeability weighed against imposing such a duty:
[A] general practitioner unfamiliar with transference, or less familiar with *229 the effects of the treatment, or who is not deliberately employing the technique in undertaking basic or situational care of a patient's mental and emotional difficulties, is less likely to foresee that an apparently consensual sexual affair with the patient may risk worsening the patient's psychological problems .... The harm and the risks are real with regard to the patient, but this Althaus factor focuses on foreseeability respecting the doctor and whether a concomitant duty may reasonably be imposed on a general practitioner based solely on the nexus of some degree of mental or emotional care and the occurrence of a sexual relationship.
Thierfelder , 52 A.3d at 1276-77.
In Seebold , we held that a prison health service provider had no duty to a corrections officer who contracted a communicable infection from an inmate whom the provider's agents had treated. In that case, the officer alleged that Prison Health Services failed to diagnose inmates (whom she was tasked with strip-searching) with methicillin-resistant staphylococcus aureus (i.e. , MRSA). The trial court rejected the plaintiff's argument that DiMarco established such a duty, but the Superior Court disagreed.
This Court agreed with the trial court. We distinguished DiMarco's imposition of a duty to provide an infected patient with sound advice regarding infection and transmission from requiring a health care provider "to identify, seek out, provide information to, or otherwise take affirmative steps outside the physician-patient relationship to protect third-party non-patients." Seebold , 57 A.3d at 1243. Turning to the Althaus factors, we underscored our "default position that, unless the justifications for and consequences of judicial policy[-]making are reasonably clear with the balance of factors favorably predominating, we will not impose new affirmative duties." Seebold , 57 A.3d at 1245.
Among other considerations, the courts' reluctance to impose new affirmative duties reflects that the wider field of common-law duties is governed appropriately by existing broad precepts which have been well traveled. In scenarios involving an actor's affirmative conduct, he is generally "under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act." RESTATEMENT (SECOND) OF TORTS § 302, cmt. a (1965).... Generally, however, there is no duty to protect or rescue someone who is at risk on account of circumstances the defendant had no role in creating. See, e.g., Yania v. Bigan , 397 Pa. 316, 155 A.2d 343, 346 (Pa. 1959) (citing RESTATEMENT (SECOND) OF TORTS § 314 ["Duty to Act for Protection of Others"] for the proposition that a mere observer has no duty to rescue).
Affirmative duties ... are the primary exception to the no-duty rule in rescue/protection scenarios where the defendant did not create the risk resulting in harm to the plaintiff-these most often arise out of special relationships of care between the parties.
Seebold , 57 A.3d at 1246 (citations modified or omitted; footnote omitted).
The plaintiff relied primarily on the foreseeability of the harm and the protection of corrections officers, declining to provide material advocacy regarding the other factors recognized in our case law and particularly in Althaus . We emphasized that neither foreseeability nor any other single consideration of policy is "alone determinative of the duty question." Id. at 1249. Rather, we must afford such weight to each factor as is warranted by "the particularized nature of the asserted *230 duty at hand and context." Id. Ultimately, we found that deficiencies in the plaintiff's advocacy substantially impaired our ability to engage in deeper review. Id. at 1248-50 (favoring the "default approach" where the plaintiff failed to provide "policy arguments" of the sort prescribed under Althaus in favor of focusing on foreseeability and the putative controlling effect of DiMarco , Troxel , and the Restatement). In the absence of such advocacy, we concluded that the policy interest in protecting corrections officers must yield where the proposed means of protection presents prison healthcare providers with serious logistical challenges, threats to physician-patient confidentiality, and expansive liability, especially when the risk at issue might be ameliorated by other means.[17]
B. UPMC's Reporting Obligation
With this common-law background in mind, we turn now to the case at hand. While we employ a conventional Althaus analysis in assessing the prudence of imposing the duty that Plaintiffs seek, we begin by reviewing the legal obligation that Plaintiffs submit as supporting the imposition of that duty.
Although Plaintiffs abandoned their negligence per se claims by declining to appeal the portion of the trial court's order sustaining Defendants' demurrers as to those claims, duty in ordinary negligence nonetheless may be informed by compliance with legal requirements, as it was in Witthoeft (even if in that case we ultimately declined to impose a duty).[18] Indeed, inasmuch as we often cite our preference for legislative judgments regarding social policy over judicial ones, considering the intentions reflected in statutes and regulations puts us on a firmer footing than we enjoyed in a number of the foregoing cases. In this case, the Superior Court and Plaintiffs have relied substantially upon the DEA regulations as an important, though by no means the exclusive, source of the duty they would have us impose.
Pursuant to authority vested in the DEA by the Controlled Substances Act, individuals and entities that are registered to distribute or dispense controlled substances must notify the DEA of any significant theft or loss of such substances, as follows:
The registrant shall notify the Field Division Office of the [DEA] in his area, in writing, of the theft or significant loss of any controlled substances within one business day of discovery of such loss or theft. The registrant shall also complete, and submit to the Field Division Office in his area, DEA Form 106 regarding the loss or theft....
21 C.F.R. § 1301.76(b).
DEA Form 106,[19] of which we take judicial notice, delineates some of the information *231 that a reporting registrant is expected to provide. It provides fields for information that would identify when the loss resulted from a criminal act, including the "Date of Theft or Loss." It further requests information regarding the type of theft, if any, including "[n]ight break-in," "[a]rmed robbery," and "[e]mployee pilferage." If the loss is identified as an armed robbery, the reporting registrant should indicate whether anyone was killed or injured. Finally, the form asks whether the theft was reported to the police.
UPMC notes that the form lacks any field or instruction regarding the identity of the perpetrator. However, the regulation, viewed in tandem with Form 106, makes clear that, while the form is a necessary component of discharging a registrant's reporting obligation, it is not necessarily sufficient . Subsection 1301.76(b) requires written notice within one business day of the "theft or significant loss of any controlled substance," but makes clear that it considers such notice to be distinct from Form 106 in its requirement that, in tandem with provision of written notice, "[t]he registrant shall also complete" and submit Form 106. 21 C.F.R. § 1301.76(b) (emphasis added). Notably, Subsection 1301.76(b) highlights several types of information not specifically anticipated by Form 106 as being relevant to the determination whether a loss is "significant," which in turn dictates whether reporting is required in the first instance. For example, Subsection (b)(6) calls for consideration of "[l]ocal trends and indicators of the diversion potential of the missing controlled substances"; Subsection (b)(5) calls attention to "[w]hether the specific controlled substances are likely candidates for diversion"; and Subsection (b)(3) suggests that the reporting registrant assess "[w]hether the loss of the controlled substances can be associated with access to those controlled substances by specific individuals " (emphasis added). Thus, that a given piece of information is not expressly mentioned by Form 106 is not conclusive as to whether the DEA sees value in, or entertains the prospect of taking action based upon, such information.
In addition to the text of the regulation, we also have the benefit of DEA's rule-making commentary. In the ordinary course of modifying an earlier version of the rule to specify that a written report must be made within one business day of the discovery of the loss or theft, the DEA provided the following guidance:
The purpose of immediate notification is to provide an opportunity for DEA, state, or local participation in the investigative process when warranted, and to create a record that the theft or significant loss was properly reported. It also alerts law enforcement to more broadly based circumstances and patterns of which the individual registrant may be unaware. This notification is considered part of a good-faith effort on the part of the regulated industries to maintain effective controls against the diversion of controlled substances, as required by 21 CFR 1301.71(a). Lack of prompt notification could prevent effective investigation and prosecution of individuals involved in the diversion of controlled substances .
* * * *
The theft of controlled substances from a registrant is a criminal act .... Although not specifically required by DEA law or regulations, the registrant should also notify local law enforcement and *232 state regulatory agencies. Prompt notification of law enforcement agencies will allow them to investigate the incident and prosecute those responsible for the diversion .
Proposed Rules, Reports by Registrants of Theft or Significant Loss of Controlled Substances, 68 F.R. 40576-01 (proposed July 8, 2003) (to be codified at 70 F.R. 47094-01 ) (emphasis added).[20]
In light of these commentaries, it is reasonable to infer that the DEA recognizes two benefits to these reporting requirements. First, the rule enables the DEA to monitor patterns of diversion that might signal a systematic effort to traffic in controlled substances, and enables enforcement and controls to prevent such activities, which is in keeping with the intent of the Controlled Substances Act. See Gonzales v. Oregon , 546 U.S. 243, 250, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (observing that the Act embodied the intent to "combat[ ] drug abuse and control[ ] the legitimate and illegitimate traffic in controlled substances"). Second, such reports may lead to and/or advance the identification, investigation, and prosecution of individual diverters like Kwiatkowski.
C. Althaus (1): The relationship between the parties
Having surveyed the regulatory background, we now consider how it informs the question of Defendants' duty.[21] We begin by examining the relationships at issue in this case, which implicate the first Althaus factor.
Typically, whether the defendant owes a duty to the plaintiff arises from the relationship between those parties, not the relationships between agents of the injury who stand between or outside plaintiff and defendant. Thus, in the New York Court of Appeals' seminal decision in Palsgraf , Chief Judge Benjamin Cardozo observed that, "before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining , the observance of which would have averted or avoided the injury." 162 N.E. at 99-100 (quoting W.V. Cent. & P. Ry. Co. v. Md. ex rel. Fuller , 96 Md. 652, 54 A. 669, 671-72 (1903) ) (emphasis added); cf. Dahlstrom v. Shrum , 368 Pa. 423, 84 A.2d 289, 290 (1951) (quoting Palsgraf , 162 N.E. at 100 ) ("The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or others within the range of apprehension.").
Whence, our time-honored general rule:
Although each person may be said to have a relationship with the world at large that creates a duty to act where his own conduct places others in peril, Anglo-American common law has for centuries accepted the fundamental premise that mere knowledge of a dangerous situation, even by one who has the ability to intervene, is not sufficient to create a duty to act.
Wenrick v. Schloemann-Siemag Aktiengesellschaft , 523 Pa. 1, 564 A.2d 1244, 1248 (1989) (emphasis in original); see *233 Feld v. Merriam , 506 Pa. 383, 485 A.2d 742, 746 (1984) ("[T]here is a general rule against holding a person liable for the criminal conduct of another absent a preexisting duty."). Accordingly, "[t]he fact that the actor realizes that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action," RESTATEMENT (SECOND) OF TORTS § 314, "irrespective of the gravity of the danger to which the other is subjected and the insignificance of the trouble, effort, or expense of giving him aid or protection." Id. § 314 cmt. c; see Seebold , 57 A.3d at 1246 (noting our reliance upon Section 314 in Yania , 155 A.2d at 346 ).
The lower courts and the parties acknowledge the lack of direct relationship between Plaintiffs and Defendants. See, e.g., Walters , 144 A.3d at 118. However, "[w]here the defendant stands in some special relationship with the person whose conduct needs to be controlled, a duty may be imposed." Id. ; see RESTATEMENT (SECOND) OF TORTS § 315 (1965), supra n.12; Emerich , 720 A.2d at 1036 (holding that duty may lie "where the defendant stands in a special relationship to either the person whose conduct needs to be controlled or in a relationship to the foreseeable victim of that conduct"). The Superior Court noted that Kwiatkowski was an employee or agent of Defendants at the time the duty to report arose, see R.W. , 888 A.2d at 747 ("[D]uty is predicated on the relationship that exists between the parties at the relevant time."), and that a special relationship may include a master's duty to control a servant, pursuant to the Restatement (Second) of Torts § 317.
As well, Section 319 of the Restatement identifies a special relationship where "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others." RESTATEMENT (SECOND) OF TORTS § 319. The Superior Court focused upon Section 319, concluding that it established a qualifying special relationship because Defendants knew of his diversion and substitution and knew that "he was dangerous and likely to cause bodily harm to others if not controlled" while he remained under their control. Walters , 144 A.3d at 119. Defendants could have exercised control in this instance and could have discharged their duty, the Superior Court concluded, by reporting Kwiatkowski's conduct to the DEA and/or another law enforcement agency.
Defendants dispute the Superior Court's ruling to the extent that it relies upon either Section 317 or 319. Under specific circumstances, Section 317 imposes a duty upon a master to control a servant.[22] Plaintiffs argue, in effect, that a master could control its servant "acting outside the scope of his employment," presently or prospectively, by satisfying a duty to report. Indeed, relative to the terms of Section 317, it is not unfair to say that, when Kwiatkowski diverted controlled substances and substituted other substances *234 for them, he was acting outside the scope of his employment on the premises of UPMC, which also were premises he was privileged to enter only as Maxim's servant, and that UPMC and/or Maxim arguably knew of their ability to control him and were aware of the opportunity to do so, albeit indirectly, by reporting his conduct to the DEA and/or another law enforcement agency.
Plaintiffs' resort to Section 319 is less convincing, though Plaintiffs depend here as well upon the proposed duty to control by reporting illegal diversion to the DEA or another law enforcement agency. Section 319 provides that "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Id. § 319. The commentary to Section 319 suggests that it is intended to apply in two situations: first, when "the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal," and, second, when "the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know." Id. § 319 cmt. a. Only two illustrations are provided, one involving a hospital that allows patients infected with a communicable disease to escape, thus infecting others, and another concerning a mental institution's failure to restrain a "homicidal maniac" who flees and injures a third party. These examples comport with Defendants' contention that Section 319 should apply only when the third person in question is "confined, submissive or otherwise fully subjected to the control of the defendant," and we are aware of no binding authority to the contrary. See Brief for UPMC at 23 (citing Johnson v. Johnson , 410 Pa.Super. 631, 600 A.2d 965, 971 n.7 (1991) ) (emphasis omitted).
Focusing strictly upon the relationships at issue, we conclude that Defendants were in respective master-servant relationships with Kwiatkowski when the putative duty to report arose. Such reports might have led to the end of Kwiatkowski's career working for CSA registrants, because the same regulation that imposes the duty to report also provides that a registrant "shall not employ, as an agent or employee who has access to controlled substances, any person who has been convicted of a felony offense relating to controlled substances." 21 C.F.R. § 1301.76(a). Inasmuch as a felony prosecution of Kwiatkowski could have followed upon a report to either DEA or another law enforcement agency, as it ultimately did in New Hampshire for the same conduct, this factor clearly supports imposing a duty to report upon both UPMC, and to a lesser extent Maxim, given that it could have done so even absent the legal reporting obligation that applies to UPMC.
D. Althaus (2): The social utility of the actor's conduct
The conduct at issue here, i.e. , the act or omission upon which liability is asserted, is Defendants' failure to report the diversion of fentanyl, and Kwiatkowski's role in that theft, to the DEA or (perhaps) other law enforcement authorities. The Superior Court acknowledged UPMC's important function in providing health care services to the community as well as Maxim's role in providing staffing in furtherance of those services. The court found that imposing the duty would "not unduly hinder [Defendants] from performing their vital functions, and in fact, would operate to their benefit in protecting these entities from unwittingly hiring drug-impaired and unreasonably dangerous health care workers."
*235 Walters , 144 A.3d at 119. "[R]eporting is not such an arduous task as to divert attention or resources from the mission of providing quality health care," the court continued, especially because the law already required that much of UPMC. Id. Thus, the Superior Court appeared to view the social utility factor as favoring the imposition of the asserted duty upon both Defendants.
To some extent, a focus upon the burden a duty to report places upon UPMC and Maxim overlaps with the fourth Althaus factor, which concerns itself squarely with the consequences of imposing a duty. To the extent that the "conduct" at issue in Althaus's second factor is understood to refer to Defendants' failure to take more steps than they did to ensure that Kwiatkowski did not repeat his dangerous and criminal conduct while employed with other health care providers, there can be no question that such a failure lacks all social utility. In Phillips , we weighed the social utility in providing the convenience of disposable lighters used safely against the lack of social utility in providing such lighters without features designed to prevent children from causing fires, especially given the modest burden of requiring such features. Here as well, against the clear social utility furnished by any health care provider we weigh the lack of social utility in failing to take analogous steps to enhance public safety where it is practicable to do so.
With regard to UPMC, we agree with the Superior Court that there is, of course, social utility in its provision of health care. To this we will add that there is related social utility in managing the costs of such care, which are affected by the degree of liability exposure a provider faces. Conversely, as a registrant under the CSA with a duty to report the diversion of controlled substances to the DEA, federal law and rule-making make clear that the government considers it of paramount concern that registrants minimize the diversion of controlled substances, and adhere promptly to strict rules requiring the reporting of such diversions when they occur, further suggesting that registrants supplement such reports by reporting known thefts to other law enforcement agencies. The United States government thus has determined that there is social utility in ensuring that registrants act in furtherance of the government's interests in oversight and law enforcement by reporting loss or theft, and not just mandatory reporting to the DEA. Ultimately, we believe that the reporting burden we determine should be imposed upon UPMC is modest enough that it is more or less in equipoise with the social utility in limiting CSA registrant health care providers' liability exposure and managing health care costs, and thus weighs neither for nor against imposing such a duty on UPMC.
With respect to Maxim, the analysis diverges somewhat because no governing body with jurisdiction in Pennsylvania has opted to impose a similar reporting requirement upon non-registrants. To be clear, we discern no social utility in Maxim's failure to report known criminality of the sort at issue in this case, but Maxim is not subject to a legal manifestation of the United States government's specific judgment that social utility lies in requiring Maxim to do so. As the Superior Court noted, there also is clear social utility in the presumptive efficiencies that staffing agencies introduce to the health care environment. Given that we find this factor neutral relative to UPMC, and that we find the social utility analysis somewhat less compelling as to Maxim, we conclude that this factor weighs against imposing such a duty upon Maxim.
*236 E. Althaus (3): The nature of the risk imposed and foreseeability of the harm incurred
It would be difficult to overstate the risk to public health that this case presents, and we need not do so; the sheer number of exposed patients and the potentially severe consequences of infection with hepatitis C speak for themselves. Diversion and substitution of injectable medications lead to two identifiable harms. First, patients do not receive the substance that they are prescribed, which they require for their treatment. Second, where needles are reused, there is the risk of disease transmission. As in Phillips , the risk presented in this case is grave, and its potential sweep broad where, as here, the offending behavior goes unchecked for years.
In turning to foreseeability, we confront the most elusive Althaus factor, both in its definition and in determining the weight it should be afforded. The Superior Court found that foreseeability weighed heavily in favor of imposing a duty. The court noted that the risk of transmission of blood-borne diseases was both "serious and foreseeable," and accepted Plaintiffs' reliance upon Charlie v. Erie Insurance Exchange , 100 A.3d 244 (Pa. Super. 2014), for the proposition that foreseeability "means the likelihood of the occurrence of a general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury." Id. at 256. However, the court added little more than a bare recitation of the pleadings to support its conclusion. Furthermore, Charlie , which bears little resemblance to the instant case, offers an especially broad definition of foreseeability, one somewhat at odds with the definitions we have employed in the third-party duty cases we discussed above, such as DiMarco's "foreseeable orbit of risk of harm." 583 A.2d at 424 ; see Cantwell , 483 A.2d at 1354 (finding that duty requires "foreseeable harm to a foreseeable class of plaintiffs ") (emphasis added); cf. Commonwealth Dep't of Hwys. v. Eldridge , 408 Pa. 391, 184 A.2d 488, 491-92 (1962) ("[A]n act cannot be negligent unless the harm is foreseeable to the class to which the complaining party belongs ....") (emphasis added).
It is reasonable, nonetheless, to hold the view that the seasoned health care providers involved in identifying Kwiatkowski's misconduct could have anticipated that, were he to repeat his behavior elsewhere, it would create a serious risk of transmission of infectious disease. Moreover, given their presumptive familiarity with the compulsions and impulsiveness associated with addiction, those providers could have anticipated that Kwiatkowski would repeat his behavior elsewhere. Thus, we agree with Plaintiffs that Kwiatkowski's behavior certainly could have supported the inference by UPMC and Maxim that his addiction to narcotics was such that he would risk-as, indeed, he had risked-his career and the health of patients. Furthermore, it was foreseeable to UPMC and Maxim that future diversion and substitution would create a risk of disease-transmission through needle-sharing; that reporting to DEA or law enforcement body would lead to a criminal investigation and a felony prosecution that would end Kwiatkowski's career in the employ of CSA registrants; and, consequently, that failing to report might create an unreasonable risk to third-party patients in the care of other registrant health care providers.
While the picture painted by the cases we reviewed above is blurry, we generally have held that the more specific or narrow is the likely victim or class of victims, the more foreseeable is the risk of harm. Thus, in Lindstrom v. City of Corry , 563 Pa. 579, 763 A.2d 394 (2000), although we denied *237 relief following a full Althaus analysis, we found that it was legally foreseeable to a police officer pursuing a suspect that the pursuit would lead the suspect to act in ways injurious to himself. But in Sellers v. Abington , 630 Pa. 330, 106 A.3d 679, 689 (2014), under very similar circumstances, we declined to find it foreseeable that the passenger of a suspect fleeing a pursuing police officer could be injured. Thus, an injury to the passenger, who was unknown to the police officer, was unforeseeable, even though injury to the suspect was.
Importantly, our cases collectively establish that "narrow" does not necessarily mean small in number. In Phillips , for example, we found a duty to protect that subjected the defendants to the potential for hundreds, even thousands, of lawsuits arising from fires set by children in possession of butane lighters lacking safety features-including fires resulting in fatalities to children and others and/or immense property damage. And while the class of juvenile fundraisers we found a duty to protect in R.W. was certainly less numerous, it nonetheless was still broadly categorized. Moreover, as we noted in Seebold , what sometimes seems like an unintuitively narrow account of foreseeability simply masks the fact that the Court, in fact, has found that other Althaus factors outweigh foreseeability in discerning whether the imposition of a duty would reflect sound policy. See Seebold , 57 A.3d at 1249 n.25 (clarifying that the somewhat "cryptic" usage of "foreseeability" in Witthoeft should not be read to "suggest that the Court believed that it was unforeseeable that an accident might occur. Rather, the context reveals the Court was prioritizing other policy factors over such obvious foreseeability").
Upon discovering Kwiatkowski's misconduct, UPMC and Maxim had every reason to suspect that this was not a one-time occurrence, as revealed by the number of syringes they found in his possession and the substances they found in his blood. Thus, they had reason to recognize that taking no action beyond terminating Kwiatkowski from the hospital created a foreseeable risk that Kwiatkowski would continue to work in the field and repeat the same dangerous behaviors causing greater risk than if UPMC had reported the diversion to DEA as prescribed by law. While Maxim did not share UPMC's legal reporting obligation, this does not diminish Maxim's ability to foresee that taking no steps to reduce the likelihood that Kwiatkowski would repeat the same behavior at another health care facility would increase the seriousness of the risks presented. Accordingly, foreseeability weighs in favor of imposing a duty upon Defendants to report Kwiatkowski to the DEA or another law enforcement agency.
F. Althaus (4): The consequences of imposing a duty upon the actor
With regard to the consequences of the duty asserted, Defendants principally and not unreasonably invoke the specter of broad, effectively unlimited liability spanning both time and geography. The Superior Court rejected this argument, declining to accept "that the imposition of a duty to report is so onerous as to be 'entirely unworkable,' " and noting that the court did not "cower from claims of exposure to 'limitless liability unchecked by the passage of time, proximity, or scope of harm' for what could be a mere clerical error." Walters , 144 A.3d at 119 (quoting UPMC's Brief). "Imposition of a duty is but the first step in imposing liability," the court explained. Id. "Recovery hinges on proof of breach and causation, and we recognize that it becomes more difficult to prove the latter with the intervening circumstances that come with the passage of time." Id. at 119-20.
*238 While we find merit in the Superior Court's observations and restraint, Althaus nonetheless requires the court at least to weigh the consequences of imposing a duty against the other factors. Furthermore, the question of law that is presented concerns duty alone. Thus, in assessing whether sound policy dictates that a duty should lie, a court's conclusion should not be influenced by ancillary considerations regarding the applicable standard of care and what constitutes breach thereof, nor should it fall back on speculations regarding whether and to what extent difficulties in proving causation might protect against overwhelming liability. These factors have no direct bearing upon the legal question of duty and are properly reserved for a fact-finder after the development of an adequate record upon which to base such determinations. See Emerich , 720 A.2d at 1044 ("While the existence of a duty is a question of law, whether there has been a neglect of such duty is generally for the jury."). Threshold legal determinations like the existence of a duty save parties from the burdens of a trial where one is not warranted. To downplay the likelihood that the plaintiff will succeed in establishing breach of duty and causation says nothing about whether a party should be exposed to a full-dress trial in the first instance.
Put simply, Defendants' fear of runaway liability warrants more detailed consideration than the Superior Court undertook. Before this Court, Defendants do not stop with the observation that one small error could lead to tremendous liability, although that is the primary thrust of their argument. UPMC also asks this Court to consider just how far the proposed duty to report might reach, asking, inter alia , whether "liability extend[s] to vehicular accidents that the diverter might cause due to being impaired," or indeed to "the full spectrum of criminal activity in which a drug user might engage?" Brief for UPMC at 29-30. Defendants also note that the lower court did not restrict its ruling to the timely completion and submission of Form 106. Instead, it held that Defendants' duty extended to "report[ing] Kwiatkowski's criminal conduct to the DEA and/or other law enforcement agencies for prosecution ." Walters , 144 A.3d at 121 (emphasis added). Thus, even if UPMC satisfied the relatively discrete task of completing Form 106, it could not be confident that it had fully shielded itself from liability in a given case. It is insufficient to answer UPMC's concern regarding the breadth of its exposure, as Plaintiffs do, "Just fill out the form," at least when taken in tandem with the Superior Court's more broadly-worded account of the duty. Similarly, Maxim underscores the relative unboundedness of asserting a vague duty to report malfeasance to law enforcement generally, and suggests that such a broad duty confounds our circumspect approach to creating novel common-law duties.
The question of consequence weighs heavily in this case, much as it did in Phillips . There can be no dispute that imposing the duty upon one or both Defendants comes at potentially great cost caused by the transient error of only one agent or employee. However, as in Phillips and R.W. , the potential for tremendous harm to innocent patients cannot be gainsaid. We must ask who should bear the cost under extraordinary circumstances like these, and we must choose between imposing that cost upon health care providers, who have the opportunity (and in UPMC's case, the obligation) to take steps to prevent the harm, or upon the victims and society at large.
The scope and severity of the risk at issue are self-evident. Thus, we focus upon the burden of imposing the duty upon each *239 Defendant. With respect to UPMC, we cannot agree with Plaintiffs that fulfilling the duty as described by the Superior Court is tantamount to no burden at all on the basis that it already has a federal obligation to report. UPMC has a legal obligation to report only to the DEA and no one else. However, Plaintiffs advocate, and the lower court imposed, a broader duty encompassing a parallel and facially independent obligation to report Kwiatkowski and others like him to law enforcement agencies outside the DEA. This open-ended duty raises challenging questions regarding which (and, for that matter, how many) agencies must be contacted, how many such contacts must be made, and how much information must be provided. We hesitate to impose a duty so broad and indeterminate.
Measuring UPMC's limited reporting obligation under federal law against the foreseeable risk of harm, we find that this factor favors imposing some duty upon UPMC. However, we think it neither necessary nor prudent to adopt outright the Superior Court's formulation. Below, we take up the proper scope of the duty to be imposed.
With respect to Maxim, however, the question is more complicated. Unlike UPMC, Maxim has no defined statutory or regulatory legal obligation to report the diversion of controlled substances by one of its employees. Thus, the only apparent way to frame Maxim's duty would be as the Superior Court did-in the form of a broad, generalized mandate to report some quantum of information concerning the diversion in some fashion to some law enforcement agency or agencies, precisely the problem we identify above with respect to UPMC. As addressed below, UPMC's particular legal obligations illuminate a way to meaningfully circumscribe its duty. The same is not true with respect to Maxim. Thus, we find that the quantum, breadth, and durability of liability Maxim would face for the violation of such a duty somewhat outweighs the foreseeable risk of harm. This is especially so given that cases such as these will always, or almost always, involve a registrant who is chiefly responsible for controlled substances, and thus injured parties typically will not be entirely denied an avenue for relief.
G. Althaus (5): The overall public interest in the proposed solution
It goes without saying that sound public policy favors taking all reasonable steps to safeguard against Plaintiffs' tragic harm. Kwiatkowski's conduct in this case was surpassingly reckless and reprehensible, exposing untold numbers of patients to a potentially fatal disease. Furthermore, the risk of Kwiatkowski conducting himself at another hospital as he did at UPMC was reasonably foreseeable, as was the seriousness of the harm that such conduct could inflict and the number of victims it might affect.
Of course, there is a competing public interest in ensuring that there are adequate health care providers in all beneficial forms to provide efficient, affordable care. While institutional CSA registrants like UPMC tend to be large and capable of absorbing such claims by any number of means, the same may not be true of all staffing agencies. We must acknowledge that to impose equivalent duties as to both Defendants is tantamount to imposing equivalent exposure, which presumably will more frequently present an existential threat to a staffing agency than it will to a larger health care provider. As well, that Maxim and presumably many other staffing agencies are not CSA registrants situates them outside the orbit of health care institutions upon which the federal government has imposed a duty to report.
*240 For these reasons, and those set forth above at greater length, we find that public policy generally weighs in favor of imposing the duty upon UPMC in light of its preexisting obligation and the policy judgments it reflects. However, given the specter of the all but necessary indeterminacy of the duty Maxim would bear and the fact that the federal government in enacting laws and regulations reflective of its assessment of public policy declined to impose such an obligation on non-registrants, we find that this factor militates against imposing a duty upon Maxim.
III. Application and Conclusion
When it enters into judicial decision-making, "public policy can be 'a very unruly horse.' " Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Res. Found. v. PriceWaterhouseCoopers , LLP , 605 Pa. 269, 989 A.2d 313, 330 (2010). Thus, "unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors predominating, we will not impose new affirmative duties." Seebold , 57 A.3d at 1245. In Althaus , we fashioned a map to guide our inquiry. While useful, that map necessarily requires the Court to perform a degree of educated reckoning informed by the collected experience embodied in our common law. See id. at 1249 ("[I]n administering a broad policy assessment such as the Althaus inquiry, the Court assigns appropriate weight to each salient policy factor, depending on the particularized nature of the asserted duty at hand and context.").[23] Thus, when enshrining a new common-law duty, this Court must take care not to define it too broadly.
A. Applying the Factors to UPMC
Some considerations weigh in favor of UPMC. We have reservations regarding whether UPMC and Kwiatkowski truly had a special relationship in the legally relevant sense, and we acknowledge the social utility of health care services. We acknowledge as well the concern for managing health care costs generally, in light of UPMC's conjecture that imposition of a duty here will, by allowing for additional liability exposure, at least put pressure on the latter consideration. For the reasons set forth above, every other consideration tilts to some extent in favor of imposing some duty to report. The United States government has made a powerful statement of its interest in managing the movement of controlled substances, and in identifying people who do so illegally, in the CSA itself as well as in the regulations promulgated thereunder, and in particular in the rules from which Plaintiffs derive the duty they seek to impose. While the liability exposure is considerable, the sweep and severity of the reasonably foreseeable harm in the offing ultimately dwarfs our concern for exposure, especially considering the relative modesty of satisfying the duty. Accordingly, we conclude that UPMC has a duty to report.
The challenge lies in defining that duty. Importantly, we need only decide the case before us. We leave future cases to be *241 decided on their own facts. The case-specificity and restraint evident in our prior decisions suggest that it is imperative that we carefully delimit the duty to be imposed relative to the circumstances of the case presented. Presently, we discern UPMC's duty to arise primarily from the expressions of public policy manifest in the governing federal statutes and regulations, and the priorities they reflect.[24] Thus, whatever form that duty takes must be traceable to those expressions.
That being said, we hesitate to impose a duty that is coextensive with the distinct, highly determinate federal reporting obligation, which would deny UPMC recourse to evidence that it took actions to call regulatory or law enforcement attention to the malefactor that was materially equivalent to, or just as likely to be effective as, satisfying its federal reporting obligation. The analysis calls for a more pragmatic approach to defining the duty. Thus, while complying with the federal reporting obligation may be sufficient to discharge the duty, an analogous action to similar effect may suffice.[25] By way of illustration, UPMC maintains that it timely reported *242 Kwiatkowski to the Pennsylvania Attorney General, and it proffers documentary evidence to establish that the Office of Attorney General opened an investigation. While it is beyond our purview in reviewing preliminary objections to consider that claim or the supporting evidence, we do not discount its potential relevance later in this litigation. More to the point, even if the duty to report arises from the broad policy interests reflected in the CSA and regulations promulgated thereunder, whether a given report is sufficient to discharge that obligation as a matter of policy goes to the question of whether that duty is breached. That is not the question we are presented today, and it is not a question we purport to answer.
B. Applying the Factors to Maxim
While some aspects of the above analysis recommend subjecting Maxim to a similar duty, we find that it would not reflect a fair balance of competing interests to do so in this case. As we have emphasized, the principal source of the duty we impose on UPMC is the public policy clearly embodied in federal law. The federal government's silence as to staffing agencies like Maxim speaks just as clearly.
Implicit in our many comments over the decades regarding the slippery nature of defining a duty, and the risk of broadening liability to the breaking point, is the fact that lines must be drawn-and unfortunately must be drawn in ways that defy easy rationalization and sometimes leave victims without a remedy. We find that UPMC's reporting obligation, and Maxim's lack of such an obligation, require us to draw the line between those parties under the facts of this case.
The generalized duty to inform law enforcement that the Superior Court imposed upon Maxim, unbounded by the terms or requirements of a federal regulation and subject to innumerable potential controversies regarding how to report, to whom to report, and how aggressively to act to ensure an adequate response by law enforcement, simply is too amorphous, the potential consequences of doing so too difficult to anticipate. Thus, imposing such a generalized duty upon Maxim to report to law enforcement agencies lacks the clarity sufficient to determine that "the balance of factors predominat[es]" in favor of imposing the duty, Seebold , 57 A.3d at 1245, or to conclude with "reasonable certainty that the change will serve the best interests of society." Lance , 85 A.3d at 454. The duty that the Superior Court imposed upon Maxim manifestly presents the risk that a superficially appealing duty could expand in future cases into something that confounds sound public policy and defies principled limitation.[26] Moreover, to impose *243 such a duty deriving solely from reticence about the consequences of not doing so when nothing in the statutory, regulatory, or common law supports imposing such a duty upon a party in Maxim's situation confounds our time-honored reluctance to hold a party liable for another party's criminal conduct absent a special relationship. See Feld , 485 A.2d at 746. Accordingly, we find that the Superior Court erred to the extent that it imposed such a duty on Maxim.
* * * *
For the foregoing reasons, we affirm the Superior Court's ruling that UPMC had a duty to report Kwiatkowski's misconduct to appropriate authorities, subject to the limitations set forth above. However, we reverse the Superior Court's ruling that Maxim, too, had such a duty.
Justices Baer and Dougherty join the opinion.
Chief Justice Saylor files a concurring and dissenting opinion.
Justice Todd did not participate in the decision of this case, and Justices Donohue and Mundy did not participate in the consideration or decision of this case.
CHIEF JUSTICE SAYLOR, Concurring and Dissenting
I concur in the result relative to Maxim Healthcare Services, Inc., and respectfully dissent as concerns UPMC Presbyterian Shadyside.
Regarding UPMC, the majority relies upon a federally imposed regulatory duty to report the diversion of controlled substances to the federal Drug Enforcement Administration to support a state-level, judicially-created, common-law standard of care running to Appellees. See Majority Opinion, at 240-42. Per the majority decision, a breach of this reporting duty may now give rise to civil liability, on UPMC's part, for Appellees' injuries allegedly occasioned by the criminal conduct of a third party to the litigation (namely, David Kwiatkowski). See id. In so holding, the majority undertakes a loose-form duty assessment according to the generalized range of policy considerations discussed in Althaus v. Cohen , 562 Pa. 547, 756 A.2d 1166 (2000).
In my view, resort to such measures is neither necessary nor appropriate here. While the majority places great emphasis on "the expressions of public policy manifest in the governing federal statutes and regulations," id. at 241, the federal policy itself has nothing to do with tort liability or even with the protection of any particular class of individuals that would subsume Appellees.
Significantly, as the common law has developed, courts have imposed greater structure relative to particular forms of asserted duties than is manifested in Althaus . See, e.g. , Seebold v. Prison Health Servs., Inc. , 618 Pa. 632, 654, 57 A.3d 1232, 1246 (2012) (explaining that "the courts' reluctance to impose new affirmative duties reflects that the wider field of common-law duties is governed appropriately by existing broad precepts which have been well traveled").[1] As is especially relevant *244 here, this Court has adopted Section 286 of the RESTATEMENT (SECOND) OF TORTS , which provides a template for determining when a standard of conduct defined by legislation or a regulation will be adopted. See, e.g. , C.C.H. v. Phila. Phillies, Inc. , 596 Pa. 23, 41 n.16, 940 A.2d 336, 347 n.16 (2008).
One of the mandatory requirements of Section 286 is that the statute or regulation relied upon to establish a standard of care must be designed "to protect a class of persons which includes the one whose interest is invaded." RESTATEMENT (SECOND) OF TORTS § 286(a) (1965) (emphasis added). A comment in a corollary section explains:
Many legislative enactments and regulations are intended only for the protection of the interests of the community as such, or of the public at large, rather than for the protection of any individual or class of persons. Such provisions create an obligation only to the state, or to some subdivision of the state, such as a municipal corporation. The standard of conduct required by such legislation or regulation will therefore not be adopted by the court as the standard of a reasonable man in a negligence action brought by the individual.
Id. § 288, cmt. b. on clause (a) (emphasis added); cf. id. § 874A (recognizing the authority of common law courts to provide for tort liability "[w ]hen a legislative provision protects a class of persons but does not provide a civil remedy for the violation" (emphasis added) ).[2]
The Controlled Substances Act was enacted for the benefit of the general public. See, e.g. , Safe Sts. Alliance v. Hickenlooper , 859 F.3d 865, 898 (10th Cir. 2017) ; cf. State v. Garza-Villarreal , 123 Wash.2d 42, 864 P.2d 1378, 1380-81 (1993) (noting that the public at large is the victim of criminal possession of controlled substances).[3] Its provisions are "enforceable only by the Attorney General and, by delegation, the Department of Justice." Schneller v. Crozer Chester Med. Ctr. , 387 Fed. Appx. 289, 293 (3d Cir. 2010) (per curiam ). Discretion is thus vested in the executive branch to determine the circumstances under which the statutes will be enforced. See Jones v. Hobbs , 745 F.Supp.2d 886, 893 (E.D. Ark. 2010), aff'd sub nom. Williams v. Hobbs , 658 F.3d 842 (8th Cir. 2011). Given that the statute and concomitant regulations are not designed to protect any particular class of persons, governing Pennsylvania law incorporating the above Restatement provisions does not support the creation of a common law standard of care premised upon them.[4]
*245 Significantly, this "particular class" requirement has substantial justification, as it serves as a limiting principle to rationally cabin the scope of liability relative to matters that have traditionally been outside the sphere of tort law. Absent such constraints, the range of potential defendants, the concomitant liability exposure, and the administrative burden on the courts are particularly great, given the proliferation of positive law in the form of statutes and regulations.[5] The degree of expansion is particularly acute in cases such as this one-in which a federal reporting requirement designed for the benefit of the public at large is being relied upon to create civil liability exposure, which plainly would not otherwise exist at common law, in a scenario in which multiple independent actors (Kwiatkowski and the DEA) are interposed between UPMC and Appellees. Accord Perry v. S.N. , 973 S.W.2d 301, 309 (Tex. 1998) (discussing this concern in the context of a claim that a failure to report suspected child abuse should result in civil liability, on the part of a non-reporter, running to abused children).[6]
Although the majority depicts "a more pragmatic approach to defining the duty" in this case, Majority Opinion, at 241, I do not believe that it is sound to characterize the majority's treatment as something other than an adoption of a statutory reporting duty as a common law standard of care. See id. at 242 ("[T]he principal source of the duty we impose on UPMC is the public policy clearly embodied in federal law."); cf. Brief for Appellants at 42 (criticizing the Superior Court's similar approach as "essentially a negligence per se analysis by another name).[7] Finally, I *246 agree with UPMC that an analysis of the sort employed by the majority disregards the special relationship factor applicable in rescue/protection scenarios and is in strong tension with the overall thrust of Seebold , 618 Pa. at 632, 57 A.3d at 1232, and Estate of Witthoeft v. Kiskaddon , 557 Pa. 340, 733 A.2d 623 (1999).
Since I find that the majority's approach to determining whether a regulatory reporting duty should be adopted as a state common-law standard of care has the effect of displacing a core-and in my view essential-limiting principle, I respectfully dissent on this basis.

Plaintiffs have dismissed their claims against captioned defendant Medical Solutions L.L.C, which employed Kwiatkowski when he allegedly transmitted hepatitis C to Plaintiffs. Accordingly, Medical Solutions is not participating in this appeal. Relatedly, still pending before this Court is UPMC's "Application for Leave to File Supplemental Reproduced Record." Because the supplemental reproduced record it proposes does not bear upon our analysis, the application is hereby denied as moot.

In this consolidated appeal, we face materially similar (but not identical) complaints brought by the above-captioned Plaintiffs. Because we consider whether the lower court erred in overruling UPMC's and Maxim's preliminary objections in the nature of a demurrer, we take as true Plaintiffs' allegations and grant them the benefit of every reasonable inference therefrom. MacElree v. Phila. Newspapers, Inc. , 544 Pa. 117, 674 A.2d 1050, 1054 (1996). We must determine "whether, on the facts averred, the law says with certainty that no recovery is possible," and any doubt regarding the possibility of recovery must be resolved in favor of overruling the objections. Id. (quoting Vattimo v. Lower Bucks Hosp., Inc. , 502 Pa. 241, 465 A.2d 1231, 1232 (1983) ). Because the pleadings in these cases closely resemble one another, the Superior Court selected the First Amended Complaint of Thomas D. Walters and Clara M. Walters to stand for all for purposes of discussion. We do the same.

See 21 U.S.C. § 812(b)(6) (Schedule II); 35 P.S. § 780-104(2)(ii)(6) ; see also 21 C.F.R. § 1308.12(c)(9).

Morphine also is a Schedule II controlled substance. See 21 U.S.C. § 812(a)(1) (Schedule II); 35 P.S. § 780-104(2)(i)(1) ; see also 21 C.F.R. § 1308.12(b)(1)(ix).

While UPMC does not dispute its failure to report the diversion to the DEA, it avers that it promptly reported the diversion to the Pennsylvania Attorney General's office. Brief for UPMC at 10. As set forth in note 2, supra , in considering a demurrer, a court must consider only the facts averred in the complaint. Furthermore, at issue in this case in its present posture is whether UPMC had a duty to report in the first instance, not whether it discharged that duty by doing so. Consequently, even assuming UPMC's averment is true, it is immaterial to our analysis.

See 84 Stat. 1242, 21 U.S.C. §§ 801, et seq. When controlled substances are diverted, 21 C.F.R. § 1301.76(b) requires registrants within one business day of discovering the diversion to notify the DEA's local field division in writing of, inter alia , the identity and quantity of the substance lost. It is undisputed that UPMC is a registrant subject to these obligations, and that Maxim is not. See 21 U.S.C. § 822(a) ; 21 C.F.R. § 1301.11(a). Pennsylvania law, too, requires UPMC, but not Maxim, to register. See 28 Pa. Code § 25.113. Plaintiffs' complaint suggests the existence of a reporting obligation under state law, see , e.g. , Walters Complaint at 7 ¶ 33, but cites no Pennsylvania statute or regulation that imposes such an obligation. Rather, Plaintiffs cite 28 Pa. Code § 25.61(a), which provides only that "[p]ersons maintaining stocks or having controlled substances ... on hand for distribution shall provide effective controls and procedures to guard against theft and diversion of the substances," but imposes no explicit reporting obligation. Accordingly, for present purposes we focus upon the federal reporting requirement.

The Walters, Ficken, and Braun Complaints, setting forth materially the same allegations, were filed in 2012. However, the Murphy Complaint was filed in 2014, and included a claim for wrongful death.

This Court granted review of the following issues, as stated by UPMC:
(1) Whether the Superior Court's holding directly conflicts with this Court's holdings in Seebold v. Prison Health Services, Inc. , [618 Pa. 632] 57 A.3d 1232 (2012), and Althaus v. Cohen , [562 Pa. 547] 756 A.2d 1166 (2000), admonishing courts of the Commonwealth to exercise great restraint when considering the creation of new duties, especially duties to the public-at-large?
(2) Whether the Superior Court's holding directly conflicts with precedent in Estate of Witthoeft v. Kiskaddon , [557 Pa. 340] 733 A.2d 623 (Pa. 1999), which declines to impose limitless liability on healthcare providers for injuries allegedly caused by the provider's failure to report to government a patient's dangerous condition, and has profound public policy implications which mandate[ ] prompt and definitive resolution by the Supreme Court?
(3) Whether the Superior Court's creation of a new duty to report based on the reporting requirements of the federal Controlled Substance Act (Act) conflicts with the intent of the Act and is against the public policy of this Commonwealth?
Walters v. UPMC , --- Pa. ----, 168 A.3d 1261 (2017) (per curiam ).
This Court also granted review of the following issues, as stated by Maxim:
(1) Whether, in an issue of first impression and of critical statewide importance, the Superior Court [m]ajority violated longstanding precedent and deviated from existing law when it imposed upon a staffing agency [Maxim] a duty in negligence requiring it to protect the public against intentional acts of a former employee, in circumstances where: (1) there was no allegation that the staffing agency had notice that the employee had committed the same or similar offenses while employed with the agency; and (ii) the intentional acts occurred in a different state, two years after the employee's employment relationship with the staffing agency ended?
(2) Whether, in an issue of first impression and statewide importance, the Superior Court Majority violated well-established rules of civil procedure and longstanding precedent by supplying facts, and then relying on those facts for its conclusions, in circumstances where those facts clearly do not appear in Plaintiffs' Complaint?
Walters v. UPMC , --- Pa. ----, 168 A.3d 1263 (2017) (per curiam ).

Cf. Alderwoods (Pa.), Inc. v. Duquesne Light Co. , 630 Pa. 45, 106 A.3d 27, 40 (2014) ("We find [the Althaus factors] to be more relevant to the creation of new duties than to the vindication of existing ones. It is not necessary to conduct a full-blown public policy assessment in every instance in which a longstanding duty imposed on members of the public at large arises in a novel factual scenario."). Plaintiffs suggest that the duty at issue is not, in fact, a novel duty, such that we need not conduct any Althaus analysis at all. Brief for Plaintiffs (UPMC) at 21-22. However, as we discuss below, the precedents upon which Plaintiffs rely are not sufficiently analogous to the instant case so as to dictate the result without the benefit of additional consideration. We accepted review of this case because the particular duty asserted has yet to be considered by this Court.

See Duty , Black's Law Dictionary 615 (10th ed. 2014) (quoting same).

We began our discussion by reviewing the seminal decision in Tarasoff v. Regents of the Univ. of Cal. , 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976) (holding that, when a psychotherapist knows or should know that his patient presents a serious danger of violence to another, he has a duty to use reasonable care to protect the intended victim). Ultimately, we concluded that "the Tarasoff decision and its progeny are consistent with, and supported by, Pennsylvania case law." Emerich , 720 A.2d at 1037.

Section 315 provides as follows:
There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) a special relation exists between the actor and the other which gives to the other a right to protection.
Restatement (Second) of Torts § 315 (1965).

A majority of the Court recognized the existence of the duty as stated. However, a differently-constituted majority of the Court than that which agreed as to the duty concluded either that no such duty should lie or that the duty had been satisfied. Accordingly, the Court affirmed judgment in favor of the defendants.

Unsurprisingly, given elements of Witthoeft that closely track aspects of this case, Defendants argue that the harm in this case was no more foreseeable than in Witthoeft , and that Witthoeft controls. However, as noted infra , subsequently in Seebold we suggested that our reference in this passage to foreseeability served more as a proxy for a broader weighing of the consequences of imposing a duty, a reading supported by the tenor of the second excerpted paragraph, which segues seamlessly from foreseeability of the harm to the consequence of imposing a duty.

The Dissent cites Seebold for the proposition that "courts have imposed greater structure to particular forms of asserted duties than is manifested in Althaus ," and suggests that this Court's adoption of Restatement (Second) of Torts § 286 ("When Standard of Conduct Defined by Legislation or Regulation Will Be Adopted") cabined Althaus . See Conc. & Diss. Op. at 243. However, Althaus was decided long after this Court adopted Section 286, and presumptively in full awareness of Section 286's application within its narrow domain. See, e.g., Jardine v. Upper Darby Lodge No. 1973, Inc. , 413 Pa. 626, 198 A.2d 550, 553 (1964). Seebold does not purport to displace or abrogate the Althaus analysis, expressly or by implication. The circumstances of that case merely warranted truncating that analysis for reasons not present in this case.

We most frequently cite Phillips in connection with its analysis of the plaintiff's strict product liability claims. However, while in that case we found that the plaintiff had failed to establish a claim sounding in strict product liability, we found that she had established a claim regarding consideration by a jury with regard to her ordinary negligence claims.

As set forth above, supra n.15, the Dissent implies that Seebold flattened the Althaus inquiry by relying upon our commentary in Seebold as to "the court's reluctance to impose new affirmative duties" and our default resort to "broad precepts which have been well traveled." Conc. & Diss. Op. at 243 (quoting Seebold , 57 A.3d at 1246 ). Respectfully, this quotation, read in tandem with our prior case law and the limited analysis described above, is consistent with Althaus , its ancestors, and its progeny. Seebold simply underscored our reluctance to impose new duties, and both acknowledged and touched upon the Althaus factors, albeit briefly in light of the way the plaintiff argued the case.

See Heck v. Beryllium Corp. , 424 Pa. 140, 226 A.2d 87 (1966) ; cf. Brogley v. Chambersburg Eng. Co. , 306 Pa.Super. 316, 452 A.2d 743, 745-46 (1982) (collecting Pennsylvania cases in which courts admitted "safety codes and regulations" as evidence of negligence).

The version of Form 106 that applied in May 2008 may be found at https://www.reginfo.gov/public/do/DownloadDocument?objectID=5166701, which will trigger an automatic download of the pdf file (last reviewed May 30, 2018). This Court retains a copy on file.

Ultimately, the proposed rule took effect with minor modifications. See Reports by Registrants of Theft or Significant Loss of Controlled Substances , 70 F.R. 47094-01, Final Rule (Aug. 12, 2005).

In reviewing the Althaus factors, we distinguish between Defendants only where our analysis differs materially as to each. In many respects, the parties are similarly situated and our analysis is substantially the same. In those instances, we refer to Defendants collectively.

Section 317 ("Duty of Master to Control Conduct of Servant") provides:
A master is under a duty to exercise reasonable care so as to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) the servant
(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
(ii) is using a chattel of the master, and
(b) the master
(i) knows or has reason to know that he has the ability to control his servant, and
(ii) knows or should know of the necessity and opportunity for exercising such control.
Restatement (Second) of Torts § 317.

We do not share the Dissent's view that our application of the Althaus rubric is "loose-form," as we do not perceive a "tighter" form that the analysis might take. See Conc. & Diss. Op. at 243. When a court is called upon to determine whether a new common-law duty will lie in tort, any approach it might adopt will be susceptible to criticism as "loose." Common-law adjudication requires an assessment that partakes necessarily of jurisprudential policy judgments, regardless of how high we set the bar for the instantiation of new duties. See Prosser, Palsgraf Revisited , supra at 11 ("In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall.").

The Dissent seems to suggest that to consult legislative intent as embodied by positive law is to disguise a negligence per se claim-in which a statute or regulation is taken as conclusive evidence of the standard of care and its violation as a breach of the same-as ordinary negligence. See Conc. & Diss. Op. at 243-44 (focusing on the related Section 286 of the Restatement (Second) of Torts rather than by name on negligence per se ); see also C.C.H. v. Phila. Phillies, Inc. , 596 Pa. 23, 940 A.2d 336, 346-47 (2008) (relying upon Section 286 in support of negligence per se ). By assuming that we impose negligence per se , the Dissent begs the question. Rather, we take account of an applicable regulation as we assess the prudence of imposing a common-law duty and the obligations associated with it. While we discern public policy in statutory and regulatory law, we nonetheless conduct a common-law assessment, as we did in Witthoeft (albeit with a different result in that case), where we conducted our analysis without reference to Section 286. This is sensible, because, while Section 286 addresses whether and when a standard of care may be derived directly from a statute or regulation, it does not squarely inform whether and when a statute and the legislative policy judgment it reflects may be considered in determining whether to impose a proposed common-law duty in the first instance. Because we face only the latter inquiry, Section 286 has little relevance to our analysis.
The Dissent also urges that we be mindful of the principle that negligence per se will lie only when the plaintiff is a member of the class that the positive law sought to protect. See Conc. & Diss. Op. at 243-44 (citing Restatement (Second) of Torts § 288 cmt. b and § 874A). In the common-law assessment, as well, we must consider the class to be protected, but there we concern ourselves with whether the foreseeable class of injured parties is narrower than the general public writ large. Thus, in DiMarco we found the class of potential victims limited to those with whom a patient might come into contact while contagious, and we found a duty, while in Witthoeft we found that the proposed duty extended to the general public without principled differentiation, and we declined to impose the proposed duty. In Phillips , by contrast, we determined that the class of potential victims, while numerous, was sufficiently well-defined to sustain the duty. Here, as in Phillips , the class of individuals to be protected may be numerous in a severe case. However, also as in Phillips , the class is limited to a subset of the public likely to come into contact with needles contaminated in the fashion presented while in the care of CSA registrants. Thus, the class-related consideration that bears upon our common-law analysis militates in favor of imposing a duty.

In light of this qualification, the Dissent's invocation of the Restatement (Third) of Torts: Physical and Emotional Harm § 38, cmt. b, is no more relevant or persuasive than its reliance upon Restatement (Second) of Torts § 286. See Conc. & Diss. Op. at 245 n.7. The Dissent excerpts comment b to Section 38-a provision this Court never before has so much as cited, let alone endorsed-for the proposition that "reliance upon federal statutes or regulations to recognize an affirmative duty in tort law is 'analogous to a court determining that violation of a federal provision constitutes negligence per se in a tort case governed by state law.' " Id. (quoting Restatement (Third) of Torts: Physical & Emotional Harm § 38 cmt. b). Section 38, itself, provides that, "[w]hen a statute requires an actor to act for the protection of another, the court may rely on the statute to decide that an affirmative duty exists and to determine the scope of the duty." Restatement (Third) of Torts: Physical & Emotional Harm § 38. Notably, we do not suggest that federal statute or regulation requires an actor to act specifically for the protection of another , a predicate condition to Section 38. Rather, we hold that Pennsylvania tort law, as informed by policies reflected in federal law, imposes a duty of distinct contour, with the clear qualification that strict compliance with federal law may not be necessary or sufficient to satisfy that duty in a given case. Cf. id. § 19 ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party.").

See Emerich , 720 A.2d at 1045 (Flaherty, C.J., concurring) ("[O]ne can reason in so many instances that an extension of liability is merely a small step flowing naturally and logically from the existing case law. Yet each seemingly small step, over time, leads to an ever proliferating number of small steps that add up to huge leaps in terms of extensions of liability. At some point it must stop ....").

By referencing Seebold as an example of a case discussing structural restraints relative to particular permutations of duty, I have no intention of suggesting that Seebold "displace[d]," "abrogate[d]," or "flattened" the purport of the Althaus decision. Majority Opinion, at 227 n.15, 230 n.17. In this regard, I note that Althaus did not concern the discernment of a standard of care in the particular-permutation scenario presented here, i.e. , derivation of a duty from a statute or regulatory provision.

Although UPMC does not specifically cite these Restatement provisions, a running thread throughout its arguments is its contention that a regulatory reporting duty should not be converted into a common law duty where the governing regulation does not operate for the benefit of a particular class of individuals but, rather, serves the public at large. See, e.g. , Brief for Appellant at 16.

The majority correctly recites the relevant goals of investigating and prosecuting those involved in the diversion of controlled substances and enabling the DEA to monitor patterns of diversion that might signal a systematic effort to traffic controlled substances. See Majority Opinion, at 232 n.20 (referencing Reports by Registrants of Theft or Significant Loss of Controlled Substances , 70 F.R. 47094-01, Final Rule (Aug. 12, 2015) ).

I also note that some other state courts have relied upon federalism concerns in declining to adopt federal statutes or regulatory provisions as state -law standards of care. See, e.g. , R.B.J. Apartments, Inc. v. Gate City Savs. & Loan Ass'n , 315 N.W.2d 284, 290 (N.D. 1982) ("The separation-of-powers doctrine and principles of federalism militate against the adoption of [a] federal statute as the standard of care in a state negligence action when no private cause of action, either explicit or implicit, exists in the federal statute."); see also Bagelmann v. First Nat'l Bank , 823 N.W.2d 18, 27 (Iowa 2012) (reasoning that treating a federal statute as creating an independent state law duty "would have the practical effect of recognizing an implied private right of action under that statute in all but name" and would "circumvent the widely-accepted understanding that Congress did not intend to create a federal private right of action" under that statute (quoting Guyton v. FM Lending Servs., Inc. , 199 N.C.App. 30, 681 S.E.2d 465, 474-75 (2009) ) ). Given the absence of a protected class and UPMC's failure to pursue this line of argument, I will not address it further here.

See, e.g. , Barry L. Johnson, Why Negligence Per Se Should Be Abandoned , 20 N.Y.U.J. Legis. & Pub. Pol'y 247, 268 (2017) (reflecting on the "massive increase in statutory law," while explaining that "Congress alone has created twelve times the statutory law during the last fifty years than it did in the previous one hundred and fifty years." (citing Andrew J. Wistrich, The Evolving Temporality of Lawmaking , 44 Conn. L. Rev. 737, 780 (2012) ) ); Caroline Forell, Statutory Torts, Statutory Duty Actions, and Negligence Per Se: What's the Difference? , 77 OR. L. REV. 497, 497 (1998) ("We live in the 'Age of Statutes.' " (citing Guido Calabresi, a Common Law for the Age of Statutes (1982) ) ).

As the reporter for the Restatement (First) of Torts related:
There is no distinction more deeply rooted in the common law and more fundamental than that between misfeasance and non-feasance, between active misconduct working positive injury to others and passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant[.]
Francis H. Bohlen, The Moral Duty to Aid Others as a Basis of Tort Liability , 56 U. PA. L. Rev. 217, 218-20 (1908).

In this respect, I find the distinction drawn by the majority between addressing "whether and when a standard of care may be derived directly from a statute or regulation" and considering "whether and when a statute and the legislative policy judgment it reflects may be considered in determining whether to impose a proposed common-law duty," Majority Opinion, at 241 n.24, to be illusory. Accord Restatement (Third) of Torts: Phys. & Emot. Harm § 38, cmt. b (2012) (explaining that reliance on federal statutes or regulations to recognize an affirmative duty in tort law is "analogous to a court determining that violation of a federal provision constitutes negligence per se in a tort case governed by state law.").