**[J-96-2018] [MO:Dougherty, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| AUGUSTUS FELECCIA AND JUSTIN T. RESCH, | : | No. 75 MAP 2017 |
| | : | |
| | : | Appeal from the Order of the Superior |
| Appellees | : | Court at No. 385 MDA 2016 dated |
| | : | February 24, 2017, reconsideration |
| | : | denied April 26, 2017, Reversing the |
| v. | : | Judgment of the Lackawanna County |
| | : | Court of Common Pleas, Civil |
| | : | Division, at No. 12-CV-1960 entered |
| LACKAWANNA COLLEGE A/K/A | : | February 2, 2016 and Remanding for |
| LACKAWANNA JUNIOR COLLEGE, KIM | : | trial. |
| A. MECCA, MARK D. DUDA, WILLIAM E. | : | |
| REISS, DANIEL A. LAMAGNA, KAITLIN | : | ARGUED: December 5, 2018 |
| M. COYNE AND ALEXIS D. BONISESE, | : | |
| | : | |
| Appellants | : | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                              **DECIDED: August 20, 2019**

## I.      Introduction

Like the Majority, I believe that Lackawanna College had a duty to ensure that certified athletic trainers were available to treat student-athletes injured during the March 29, 2010 football tryouts.  Considering the record in the light most favorable to Feleccia and Resch, as we must, it is clear that Lackawanna College assumed this duty through its own actions and representations.[1]  As a general matter, I agree as well with the Majority's analysis regarding the enforceability of the liability waiver that Feleccia and

---

[1]      *See* Maj. Op. at 19.

Resch signed. Specifically, I join in the conclusion that the waiver was enforceable as to ordinary negligence, and not enforceable as to gross negligence.[2]

I write separately because, while the Majority limits Lackawanna College's duty to the obligation it undertook through its own actions and representations, *see* Maj. Op. at 18-19, principles of Pennsylvania tort law require us to go farther. Based upon the factors that this Court articulated in *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000), as well as the persuasive opinion of the United States Court of Appeals for the Third Circuit in *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360 (3d Cir. 1993), colleges owe a duty to their student-athletes to ensure that qualified medical personnel[3] are available to

---

[2] *See* Maj. Op. at 22-29. Notwithstanding my agreement with the Majority's ultimate conclusions regarding the enforceability of the waiver as to ordinary negligence, I would have serious reservations about this particular waiver's validity were that question properly before us. Feleccia and Resch chose to attend Lackawanna College in order to participate in its football program. Eight weeks into the spring semester, after participating in various pre-season conditioning sessions, each was required to sign a waiver in order to play on the football team. Under such circumstances, I cannot help but think that Feleccia and Resch had no genuine choice but to sign these waivers, a circumstance that suggests an invalid contract of adhesion. *See Galligan v. Arovitch*, 219 A.2d 463, 465 (Pa. 1966) (in a contract of adhesion, one party "simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely"). Moreover, in light of Lackawanna College's repeated representations that athletic trainers would be available to treat injured football players, and in view of the College's failure to deliver on that promise, it seems unconscionable to hold Feleccia and Resch to their own promises not to sue the College for their injuries. Nonetheless, before the Superior Court, Feleccia and Resch failed to challenge the trial court's determination that the waiver was not a contract of adhesion, thus waiving the issue. *See* Pa.R.A.P. 302; *Feleccia v. Lackawanna Coll.*, 156 A.3d 1200, 1212 (Pa. Super. 2017). Additionally, neither party advances an adhesion argument before this Court, thereby excluding any such claims from the scope of our review.

[3] A note on terminology: My analysis focuses on Lackawanna College's failure to ensure that "qualified medical personnel" were available during its football tryouts in the form of certified athletic trainers. I adopt this usage notwithstanding the fact that trainers generally are not physicians, inasmuch as the parties have done so, apparently because the Superior Court chose to employ this language. *See, e.g.*, *Feleccia*, 156 A.3d at 1214-15; Brief for Lackawanna College at 18, 22-23, 28-29; Brief for Feleccia and Resch at 22, 24. Moreover, under the Medical Practice Act of 1985 and its implementing regulations,

render needed assistance during school-sponsored and supervised intercollegiate contact sport activities.

## II. Legal Backdrop

### A. *Kleinknecht*

While this Court previously has rejected the doctrine of *in loco parentis* as a basis for finding that colleges owe a duty of care to their students,[4] we have not addressed whether colleges owe any duty to their student-athletes. In a case with similar facts, the Third Circuit predicted that this Court would indeed conclude that a college's relationship with its student-athletes created a duty of care to these athletes during their participation in intercollegiate contact sports. *Kleinknecht*, 989 F.2d at 1367-69. In *Kleinknecht*, a college lacrosse player suffered cardiac arrest during practice and ultimately died. No medical personnel were present at the practice, and the coaches lacked any immediate means to contact emergency services.

Distinguishing prior cases in which courts held that colleges owed no duty to their students, the *Kleinknecht* court explained that, unlike in those cases, the lacrosse player

---

in order to use the title "athletic trainer" and perform athletic training duties, an individual must be licensed by the State Board of Medicine. 63 Pa.C.S. § 422.51a(c); 49 Pa. Code § 18.503 (a)-(b). My use of the term "qualified medical personnel" here also is in recognition of both this legislative and regulatory scheme and the possibility that colleges could fulfill their duty to student-athletes by ensuring that other qualified medical personnel, who possess the requisite certification or licensure in an area specializing in the treatment of injured athletes, are on hand in lieu of certified athletic trainers. Additionally, I note that, throughout this opinion, I refer to Bonisese's and Coyne's requisite (though not attained) qualification as a "certification." At the time of the football tryouts in question, athletic trainers were "certified" rather than "licensed." In 2011, the General Assembly changed the term "certification" to "licensure," but noted that anyone who held a valid athletic training certification prior to the amendment qualified as a licensed athletic trainer under the new law. 63 Pa.C.S. § 422.51a.

4   *See Alumni Ass'n v. Sullivan*, 572 A.2d 1209, 1213 (Pa. 1990).

was not acting as a private student engaged in his own affairs when he collapsed.[5] Instead, the student was participating in a scheduled practice for an intercollegiate, school-sponsored team under the supervision of coaches employed by the college. The court also found the college's recruitment of the lacrosse player significant, noting that it could not "help but think that the College recruited [the athlete] for its own benefit, probably thinking that his [athletic skill] would bring favorable attention and so aid the College in attracting other students." *Id.* at 1368.

Additionally observing that the imposition of a duty is justified when the foreseeable risk of harm is unreasonable, the *Kleinknecht* court considered the foreseeability and magnitude of the risk at the lacrosse practice. The court found that it is "clearly foreseeable that a person participating [in an intercollegiate contact sport] will sustain serious injury requiring immediate medical attention." *Id.* at 1371. The court also opined that the "magnitude of foreseeable harm—irreparable injury or death to [a student-athlete] as a result of inadequate preventative emergency measures—is indisputable." *Id.* at 1370. Accordingly, in light of the relationship between a college and its student-athletes and the foreseeability of grave injury during athletes' participation in contact sports, the

---

[5] Specifically, the Third Circuit distinguished *Sullivan*, 572 A.2d 1209, and *Bradshaw v. Rawlings*, 612 F.2d 135 (3d Cir. 1979). In *Sullivan*, an underage student became intoxicated during an on-campus fraternity party and then started a fire. Although the student claimed that the university should have known that alcohol was being served to underage students at the party, and, therefore, should be liable for the damage caused by the fire, this Court declined to find that the college owed the student any custodial duty. We emphasized that there was no evidence demonstrating that the university was involved in planning the party or in serving, supplying, or purchasing the alcohol. Similarly, in *Bradshaw*, an underage student attended a school-sponsored picnic, became intoxicated, and later was involved in a car accident. The Third Circuit determined that the college's knowledge that underage drinking might occur did not create a duty of care to the student.

court opined that the college owed a duty "to provide prompt and adequate emergency medical services" to its intercollegiate athletes when they are "engaged in a school-sponsored athletic activity for which [they] ha[ve] been recruited." *Id.* at 1371.

### B. *Althaus*

Seven years after the Third Circuit decided *Kleinknecht*, this Court compiled earlier approaches to the duty inquiry and distilled them into a five-factor framework.[6] Observing that the concept of duty is "necessarily rooted in often amorphous public policy considerations," *Althaus*, 756 A.2d at 1169, we acknowledged that discerning a "previously unrecognized duty" is an inherently difficult task. *See Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 222 (Pa. 2018). To assist in this undertaking, we identified the following five factors for courts to consider: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus*, 756 A.2d at 1169. We also have noted that "[n]o one of these five factors is dispositive. Rather, a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant." *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008-09 (Pa. 2003).

### III. Analysis

Although some twenty-six years have passed since the Third Circuit's prediction in *Kleinknecht*, this Court has yet to resolve whether colleges owe any duty to their

---

[6] Although *Kleinknecht* predated *Althaus*, the *Althaus* framework was a distillation of previously developed approaches to the duty analysis, and the *Kleinknecht* court considered many of those same preexisting factors. In a modest divergence from the approach taken by *Althaus*, the *Kleinknecht* court appeared to treat each factor as independently sufficient to impose a duty, whereas *Althaus* requires courts to weigh each factor as part of a unitary inquiry.

student-athletes. Allowing for argument's sake that this is a new duty, a principled weighing of the *Althaus* factors leads to the conclusion that colleges owe a duty to ensure that qualified medical personnel are available to student-athletes participating in school-sponsored and supervised intercollegiate contact sports.[7]

### A. *Althaus* (1): The relationship between the parties[8]

A party's duty of care to another can arise from the parties' relationship. *See Morena v. S. Hills Health Sys.*, 462 A.2d 680, 684 (Pa. 1983). In light of the increased

---

[7] For the purpose of clarity, throughout the remainder of this opinion, I refer to school-sponsored and supervised intercollegiate contact sports simply as "intercollegiate contact sports." I incline toward the view that the presence of school sponsorship and supervision are necessary limiting factors upon a college's duty to its student-athletes, but I need not consider the necessity of these qualifications in this case because sponsorship and supervision are not disputed here and presumably are inherent in most (if not all) intercollegiate sports. Based upon the facts and briefing of this case, I also recognize a duty only in the context of contact sports, to wit, those in which participants frequently make physical contact with other participants or inanimate objects. I do not opine as to the presence or absence of a duty in sports in which contact is infrequent or inadvertent.

[8] I disagree with the Majority that an *Althaus* analysis is unwarranted, ostensibly because the parties did not argue *Althaus* below, and because the lower courts did not conduct an explicit *Althaus* analysis. *See* Maj. Op. at 15 n.7. Feleccia and Resch responded to Lackawanna College's motion for summary judgment by asserting that Lackawanna owed them a duty of care based upon the reasoning of the Third Circuit in *Kleinknecht*. As discussed *supra*, *Kleinknecht* analyzed many of the same considerations that this Court later identified as factors in the *Althaus* framework. Although Feleccia and Resch understandably did not suggest that Lackawanna College's duty was new, given the challenges presented by proposing a new affirmative duty as such, they relied upon several *Althaus* factors in support of the duty they asserted. The trial court rejected this argument, finding instead that the College owed no duty based upon the athletes' assumption of the risk. Accordingly, it was not until the Superior Court concluded that Lackawanna College owed its athletes a duty of care that Lackawanna became an appellant and had the opportunity and the occasion to argue that the court imposed a new duty requiring an *Althaus* analysis. Moreover, as even Feleccia and Resch admit, by relying heavily upon *Kleinknecht* to support its holding, the Superior Court implicitly applied the *Althaus* factors when articulating Lackawanna College's duty. *See* Brief for Feleccia and Resch at 36. The proposed duty at issue in this case has not previously been recognized by a Pennsylvania court. The lower courts and the parties recognize as much, and the *Althaus* factors have been discussed and advocated at length throughout

autonomy afforded to college students in modern times, courts have rejected the notion that colleges act *in loco parentis* or as "insurer[s] of the safety of [their] students."  *See Sullivan*, 572 A.2d at 1213 (quoting *Bradshaw*, 612 F.2d at 138).  However, despite widespread agreement among courts on this general principle, courts differ as to whether colleges owe any duty to their student-athletes.[9]  In recent decades, scholars have opined that the unique relationship between colleges and their student-athletes justifies the imposition of a duty upon the college when the athletes participate in intercollegiate contact sports.  These commentators observe that, unlike the relationship between a college and its average student, the relationship between colleges and their student-athletes is characterized by mutual benefits and by the college's assertion and exercise of significant control over the athletes' lives, thereby justifying the recognition of a duty of care.[10]

In the case before us today, the relationship between Lackawanna College and its intercollegiate football players weighs in favor of recognizing a duty similar to the one that

these proceedings.  Accordingly, it elevates form over substance to suggest that an *Althaus* analysis is unwarranted for want of advocacy.

[9]      *Compare Avila v. Citrus Cmty. Coll. Dist.*, 131 P.3d 383, 392-93 (Cal. 2006) (holding that a college that hosted an athletic event owed a duty to both its own athletes and visiting athletes based upon the college's relationship with them and the benefits it received from intercollegiate competition), *and Davidson v. Univ. of N.C. at Chapel Hill*, 543 S.E.2d 920, 927-28 (N.C. Ct. App. 2001) (finding that a college owed its cheerleaders a duty during their participation in a school-sponsored intercollegiate team based upon the mutual benefits that the cheerleaders' participation on the team generated and upon the "considerable degree of control" that the college exercised over their lives), *with Orr v. Brigham Young Univ.*, 108 F.3d 1388 (10th Cir. 1997) (unpublished table decision) (determining that the college owed no duty to prevent a student-athlete from playing football when his participation would exacerbate an existing injury), *and Fisher v. Northwestern State Univ.*, 624 So.2d 1308, 1311 (La. Ct. App. 1994) (declining to find that the university owed a duty to its cheerleaders to provide adult supervisors to monitor practice and approve the stunts that they attempted).

[10]      *See, e.g.*, Michelle D. McGirt, *Do Universities Have a Special Duty of Care to Protect Student-Athletes from Injury?*, 6 VILL. SPORT & ENT. L.J. 219, 227-29 (1999)

the Third Circuit articulated in *Kleinknecht*. Like the student-athlete in *Kleinknecht*, at the time of their injuries, Feleccia and Resch both were engaged in something other than their own private affairs. Rather, Feleccia and Resch were participating in tryouts for the intercollegiate, school-sponsored football team under the supervision of coaches employed by the college. Like the Third Circuit in *Kleinknecht*, I would find that the college expected its relationship with the student-athletes to benefit the college. Before Feleccia and Resch enrolled at Lackawanna College, its head football coach contacted both of them about playing football for the school's intercollegiate team, presumably because the college expected to gain favorable attention or other benefits from their participation in the program. Moreover, as the Majority aptly observes, Feleccia's and Resch's relationship with Lackawanna College rested in part upon their reasonable expectation, based upon the college's actions and representations, that a certified athletic trainer would treat them if they were injured during athletic activities. *See* Maj. Op. at 19.

Accordingly, like the school-athlete relationship at issue in *Kleinknecht*, the relationship between Lackawanna College and its intercollegiate football players weighs in favor of recognizing a duty.

---

(discussing the intensive time commitment required of student-athletes and colleges' encouragement and/or selection of certain majors and classes for athletes); Andrew Rhim, *The Special Relationship Between Student-Athletes and Colleges: An Analysis of a Heightened Duty of Care for the Injuries of Student-Athletes*, 7 MARQ. SPORTS L.J. 329, 338-41 (1996) (detailing student-athletes' limited autonomy and the benefits that the relationship between colleges and their student-athletes generate, including revenue, donations, media attention, and increased enrollment); Edward H. Whang, *Necessary Roughness: Imposing a Heightened Duty of Care on Colleges for Injuries of Student-Athletes*, 2 SPORTS L.J. 25, 43-46 (1995) (noting that "athletic departments exert a high degree of control over almost every aspect of a student-athlete's college life," and that the benefits colleges receive from intercollegiate athletic programs make "the need to impose a duty of reasonable care on colleges with respect to foreseeable injuries suffered by student-athletes . . . equally or more compelling" than the duty courts have imposed upon high schools in favor of their students).

## B. *Althaus* (2): The social utility of the actor's conduct

The conduct at issue in any negligence case is the "act or omission upon which liability is asserted." *Walters*, 187 A.3d at 234. In cases in which an actor's omission is at issue, courts must consider not only the social utility of the actor's conduct, but also the utility of the individual's failure to act. For example, in *Walters*, this Court weighed the social utility of UPMC providing health care services to the community against the utility of UPMC's failure to report a former employee's theft of fentanyl to the appropriate authorities. Although we concluded that UPMC's provision of health care was beneficial to society, we found that its failure to take "steps to enhance public safety" by ensuring that its former employee did not "repeat his dangerous and criminal conduct" lacked any social utility. *Id.* at 235.

Similarly, in *Phillips*, 841 A.2d 1000, this Court weighed the social utility of a company manufacturing butane lighters against the utility of the company's failure to manufacture these lighters with child safety features. After opining that the lighters had obvious social utility, we observed:

> [T]he evidence does not show that the utility of the lighter is increased when a child safety device is lacking. Conversely, it is readily apparent that a device which would prevent small children, who lack the discretion and caution of the average adult, from creating a flame would have great utility in our society.

*Id.* at 659-60. Therefore, we concluded that this factor weighed in favor of imposing a duty.[11]

---

[11] *See also Citizens Bank of Pa. v. Reimbursement Tech., Inc.*, 609 F. App'x 88, 92 (3d Cir. 2015) ("[T]he social utility factor weighs in favor of finding a duty, given that whatever social utility is gleaned from [the company's] data management services would be seriously undermined by its inability to safeguard the personal and financial information it receives to deliver those services."); *Thomas v. Staples, Inc.*, 2 F. Supp. 3d 647, 660-61 (E.D. Pa. 2014) (conducting an analysis similar to the *Phillips* Court regarding

Here, we must weigh the social utility of Lackawanna College maintaining an intercollegiate athletic program against the utility of the college's failure to ensure that qualified medical personnel were available to its student-athletes during football tryouts. Unquestionably, intercollegiate athletics furnish many benefits. As the Supreme Court of California observed in *Avila,* "[i]ntercollegiate competition allows a school to, on the smallest scale, offer its students the benefits of athletic participation and, on the largest scale, reap the economic and marketing benefits that derive from maintenance of a major sports program." *Avila*, 131 P.3d at 392. Intercollegiate athletic programs provide numerous revenue sources for colleges. In addition to the money colleges earn from ticket sales at intercollegiate athletic events, successful athletic programs serve as magnets for corporate sponsorships and substantial donations from alumni and fans.[12] These programs also exponentially increase the sales of merchandise bearing the school's name, mascot, and logo, generating significant profits for schools.[13]

Intercollegiate athletic programs also may increase the school's marketability and enrollment.[14] These programs inevitably facilitate the recruitment of other athletes, who desire to play for a reputable team. Intercollegiate athletics attract media attention,

---

the manufacture of shredders without child safety features and finding that this factor weighed in favor of imposing a duty); *Barton v. Lowe's Home Ctrs., Inc.,* 124 A.3d 349, 359 (Pa. Super. 2015) ("[T]he utility of lawnmowers is obvious, but a lawnmower outfitted with safeguards against overheating has even greater utility. This weighs in favor of the existence of a duty . . . .").

[12] *See* Whang, *supra* note 10, at 40-41; *see also* Rhim, *supra* note 10, at 339-40.

[13] *See* Whang, *supra* note 10 at 40-41.

[14] *See, e.g., id.* at 41-42 (discussing the increased enrollment of students at Georgetown University and Boston College during and following the careers of Patrick Ewing and Doug Flutie, a college basketball and football star, respectively).

expanding the school's visibility to prospective students. Further, the culture surrounding intercollegiate athletic programs improves the quality of students' college experience by fostering and enhancing school spirit, and by offering students the opportunity to participate in a variety of social activities that attend these sports. Thus, by improving the quality of campus life, such programs enhance the school's appeal to athletes and non-athletes alike. Additionally, cheering for or participating in intercollegiate sports often creates a lasting connection between students and their universities, increasing the likelihood that they will donate to the school as alumni, recommend the school to potential students, or otherwise volunteer their services in order to help the school succeed.

In contrast, Lackawanna's failure to ensure that certified athletic trainers were available during football tryouts lacks any social utility. Undoubtedly, the availability of qualified medical personnel such as certified athletic trainers increases the social utility of intercollegiate programs by providing athletes with proper medical care, and by preventing injuries like Feleccia's and Resch's. Moreover, as discussed more fully *infra*, the college's failure to ensure that qualified medical personnel were available severely undermined the benefits that intercollegiate athletics generate.

Thus, because the social utility of maintaining intercollegiate athletic programs is great, and because the failure to ensure that qualified medical personnel are available to student-athletes during intercollegiate contact sports lacks any social utility, this factor weighs in favor of imposing a duty.

**C.** *Althaus* **(3): The nature of the risk imposed and foreseeability of the harm incurred**

In addition to identifying the nature of a college's relationship with its student-athletes as a basis for imposing a duty of care upon the college, the *Kleinknecht* court also found that the college owed its athletes a duty of care based upon the foreseeability of severe injury at a practice for a contact sport. Here, the risk of injury exceeded the risk at issue in *Kleinknecht*. As observed by *amicus curiae*, the National Athletic Trainers' Association ("NATA"), collegiate football has one of the highest injury rates of all collegiate sports, and the preseason practice injury rate is over twice the rate during in-season practices. *See Amicus* Brief for NATA at 8. Moreover, college football players routinely suffer severe injuries. The drill that led to Feleccia's and Resch's injuries was a variation of the once-prevalent Oklahoma Drill, a tackling drill that has been the subject of extensive criticism during recent concussion litigation.[15] Two experts, including the former head football coach at Texas A&M University and a certified athletic trainer at Stevenson University, also opined that Lackawanna College ran a particularly dangerous variant of the drill.[16]

The foreseeability of the risk of the exacerbation of practice injuries was only enhanced when Lackawanna College employed Alexis Bonisese and Kaitlin Coyne to fulfill the roles of athletic trainers, despite the school's awareness that these two

---

[15] *See* Trial Ct. Op., 2/2/2016, at 21; *see also* Mike Florio, *NFL Bans Certain Old-School Training-Camp Drills*, NBC SPORTS (posted May 22, 2019), https://profootballtalk.nbcsports.com/2019/05/22/nfl-bans-certain-old-school-training-camp-drills/ (last reviewed July 10, 2019).

[16] *See* Expert Report of Richard C. Slocum, 4/13/15, at 3-4; Expert Report of M. Scott Zema, 9/28/15, at 2 (unnumbered).

individuals possessed neither the athletic training certifications nor the skills necessary to perform the duties of athletic trainers. *See* Maj. Op. at 3-4, 19. By employing Bonisese and Coyne, Lackawanna College not only failed to ensure that qualified medical personnel were available to care for injured football players, but also created an additional risk for the College's athletes by allowing them to receive care and advice from unqualified individuals whom the athletes believed to be certified trainers. The athletes thus were unable to make an informed decision as to whether to consult or follow the recommendations of (uncertified) staff, exposing those athletes to the hidden risk of greater injury arising from bad advice.[17]

Given the magnitude and frequency with which players sustain serious injury in contact sports, and football in particular, and given the likelihood that uncertified individuals undertaking the responsibilities of athletic trainers will render bad advice that further endangers athletes, the harm that Feleccia and Resch suffered was entirely foreseeable. In light of these considerations, Lackawanna College's failure to protect against these risks was unreasonable, and this factor weighs in favor of imposing a duty on colleges in favor of student-athletes.

---

[17] Indeed, as "first responders" (so designated by Lackawanna College), Bonisese and Coyne were unqualified to make return-to-play decisions. However, when Feleccia sought advice from Bonisese after suffering a shoulder injury during tryouts, she told him that he could return to the drill if he was feeling better. Feleccia did so, and then suffered a brachial plexus avulsion of his right shoulder immediately after returning to play. As one expert opined, this more serious injury could have been avoided had a certified athletic trainer been present to assess Feleccia's injury, or, alternatively, to ask that the coaches modify the drill to make it safer. Expert Report of M. Scott Zema, 4/9/15, at 11-13 (unnumbered).

**D.** *Althaus* **(4): The consequences of imposing a duty upon the actor**

Requiring colleges to ensure that qualified medical personnel are available to student-athletes participating in intercollegiate contact sports undoubtedly imposes a financial burden upon colleges and universities, particularly small colleges lacking the resources of larger institutions. Some schools may be hard-pressed to find the money to fulfill this obligation, and could face a difficult decision between cutting spending in other areas of their budgets and reducing the number of intercollegiate sports that they offer. Additionally, it may be difficult for some colleges to find qualified medical personnel who are willing to work for their schools, depending upon the individual's salary requirements and the location of the college. However, for several mitigating reasons, these burdens weigh only modestly, if at all, against imposing a duty upon colleges.

First, this duty is limited. Like Lackawanna College, the college in *Kleinknecht* contended that imposing a duty of care would create a slippery slope, requiring colleges to provide medical personnel for all sports, irrespective of whether the sport posed a substantial risk of injury or whether the college sponsored or supervised the athletic event. The Third Circuit rejected this argument as an "unwarranted extension" of its holding, explaining that the duty it imposed was limited to the particular facts of the case in which an athlete suffered a medical emergency while participating in an intercollegiate contact sport for which the college had recruited him. *Kleinknecht*, 989 F.2d at 1370-71. I agree generally with the *Kleinknecht* court's suggested limitation,[18] such that the duty in

---

[18] Unlike the *Kleinknecht* court, I do not understand this duty as limited to athletes whom the college affirmatively recruited to play the sport. The Third Circuit emphasized

question should extend only to intercollegiate contact sports. At least for present purposes, other athletic activities, such as intramurals, necessarily fall outside the scope of this duty.[19]

Second, Lackawanna College and colleges like it are tuition-dependent for the bulk of their revenue. *See* Deposition of Suellen Musewicz, 11/11/14, at 15. For all the reasons discussed above, maintaining an intercollegiate athletic program attracts more students, increasing tuition revenue. Indeed, Feleccia and Resch both averred that they attended Lackawanna College because they wanted to participate in its football program.[20] Furthermore, although hiring qualified medical personnel such as certified athletic trainers increases the cost of colleges' athletic programs, it also can increase the appeal of these programs to prospective student-athletes, in additional service of the above-stated benefits. By contrast, developing a reputation for employing unqualified individuals to treat injured players has the potential to decrease the number of students willing to participate on a college's sports teams. Failing to ensure that injured athletes

---

recruitment because it was an indication that the college expected to benefit from the athlete's presence on the team. *See Kleinknecht*, 989 F.2d at 1368. Because all colleges expect to benefit from student-athletes' participation on intercollegiate teams, I see no material distinction based upon the route a given athlete traveled before ultimately earning a spot on the roster.

[19]     This is consistent with the Superior Court's recent decision in *Kennedy v. Robert Morris Univ.*, 133 A.3d 38 (Pa. Super. 2016). In that case, the court held that the university owed no duty to a student-athlete because, unlike in *Kleinknecht*, the cheerleader was injured while attending a camp off-campus that was conducted, controlled, and supervised by an independent contractor.

[20]     Here, I observe further that Lackawanna College's gross revenue from the tuition of its football players in the 2009-10 season alone exceeded $2 million. *See* Lackawanna College's Responses and Objections to Plaintiff's Requests for Admission, 7/25/14, at 47.

have access to proper medical care during athletic events increases injury rates, decreasing the college's ability to capitalize on the benefits that successful programs generate. Additionally, such failures can result in litigation (as evidenced by the present case), which presents its own financial and reputational challenges for colleges.

Third, hiring qualified medical personnel is hardly cost-prohibitive. This is particularly true because the number of medical personnel a college must employ to cover its intercollegiate contact sports is dependent upon a variety of factors unique to each college. As one example, NATA has promulgated worksheets to assist colleges in calculating an appropriate amount of medical coverage for their athletic programs. These worksheets incorporate many factors, including the intercollegiate sports that the college offers, the injury rates of those sports, the length of each sport's season, and the number of participating athletes.

Using Lackawanna College as an example, to be staffed adequately in-season for all sports during the 2009-10 academic year according to NATA's recommendations, one expert opined that the college needed to hire approximately 2.27 full-time athletic trainers. *See* Expert Report of M. Scott Zema, 9/28/15, at 4 (unnumbered). This number is roughly consistent with the two full-time certified athletic trainers that Lackawanna College had on staff prior to employing Bonisese and Coyne, an expense that evidently was deemed cost-effective at the time. Thus, requiring Lackawanna College to meet NATA's suggestion would require it to do little more than restore the staffing it had prior to creating the dubious "first responder" positions for the uncertified Bonisese and Coyne.

In short, the consequences of recognizing this duty are not *de minimis*, but this impact is offset by the aforementioned considerations, particularly when considering the

facts of this case.  Thus, in my view, the fourth *Althaus* factor weighs only slightly, if at all, against imposing a duty.

### E. *Althaus* (5):  The overall public interest in the proposed solution

In cases in which we have considered whether one party owed a duty to another, this Court time and again has observed that the concept of duty amounts to "the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection."  *See Sinn v. Burd*, 404 A.2d 672, 681 (Pa. 1979) (quoting *Leong v. Takasaki*, 520 P.2d 758, 764 (Haw. 1974)).  Accordingly, like Dean Prosser, we have recognized:

> These are shifting sands, and no fit foundation . . . .  The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none.  In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall.  In the end the court will decide whether there is a duty on the basis of the mores of the community, "always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."

*Gardner v. Consol. Rail Corp.*, 573 A.2d 1016, 1020 (Pa. 1990) (quoting William L. Prosser, Palsgraf *Revisited*, 52 MICH. L. REV. 1, 14-15 (1953)).  Thus, a duty arises, in part, from society's interest in protecting the plaintiff from a certain harm.

In *Kleinknecht* and in the present case, the public has a substantial interest in protecting the health and well-being of intercollegiate athletes.  As the Superior Court observed, "[c]olleges are expected to put a priority on the health and safety of their students, especially student[-]athletes engaged in dangerous sports." *Feleccia*, 156 A.3d at 1219.  As discussed *supra*, student-athletes participating in intercollegiate contact sports face a significant and foreseeable risk of acute injury, and colleges benefit

considerably from students' participation in their athletic programs. The receipt of such

benefits at the expense of these athletes' health and well-being is, as one scholar opined,

"grossly unfair."[21]

Colleges are best positioned to ensure that their athletes receive timely, competent

medical attention when they participate in contact sports. In theory, one might suggest

that student-athletes could seek out their own treatment when they are injured and decide

for themselves when they feel well enough to return to play. The wisdom of imposing

such a responsibility on student-athletes is questionable, at best. Scholars have

observed that, when allowed to make their own decisions regarding injuries and returning

to play, collegiate athletes often are willing to sacrifice their bodies in pursuit of their

athletic goals, and to take great risks because they believe themselves to be impervious

to injury.[22] Further, in addition to the pressure that they place upon themselves, student-

athletes also experience pressure from coaches, teammates, parents, sponsors, and the

media to perform despite their injuries.[23] This pressure can cause athletes to return to

play before recovering fully from an illness or injury or to play through pain rather than

---

[21]    *See* Whang, *supra* note 10, at 45; *see also* Rhim, *supra* note 10, at 342 ("[C]olleges receive both substantial economic and non-economic benefits from student-athlete participation in intercollegiate athletic programs. From a health standpoint, it is not equitable for a college to reap these benefits from student-athletes without having a duty to provide a reasonable level of care for those athletes.").

[22]    *See, e.g.*, Michael Landis, *The Team Physician: An Analysis of the Causes of Action, Conflicts, Defenses and Improvements*, 1 DEPAUL J. SPORTS L. & CONTEMP. PROBS. 139, 149 (2003); Cathy Jones, *College Athletes: Illness or Injury and the Decision to Return to Play*, 40 BUFF. L. REV. 113, 150-58 (1992).

[23]    *See, e.g.*, Landis, *supra* note 22, at 148-52; Jones, *supra* note 22, at 150-58.

receiving necessary medical attention.[24] These considerations are only amplified in the context of a competitive tryout, when an athlete may fear losing the chance to play entirely. Moreover, the extensive training and certification required of an athletic trainer demonstrates just how unqualified student-athletes are to make their own decisions regarding whether they need medical attention and when they can return to play.[25]

Our Commonwealth's imposition of rigorous requirements on those wishing to claim the title "athletic trainer" also demonstrates the interest of our citizens, expressed through their General Assembly, in ensuring that athletes who seek athletic training services receive a certain standard of care. The Medical Practice Act of 1985 and its implementing regulations prohibit unlicensed individuals from using the title "athletic trainer" or providing athletic training services, and allow the imposition of injunctions and penalties on those who violate the Act.[26] As these laws indicate, the interest of

---

[24] *See* Landis, *supra* note 22, at 150 ("The mottos 'no pain, no gain' and 'winning is everything' are attitudes extending past the competition and the locker room."); Jones, *supra* note 22, at 152-55 (noting that these pressures incentivize players to return to play either too soon after experiencing an illness or injury, or, in the cases of serious illnesses or injuries, when they should not do so at all).

[25] *See* 49 Pa.Code §§ 18.503-18.506 (requiring athletic trainers to graduate from an approved athletic training education program, pass a certification exam, apply for a license, document any practice as an athletic trainer and any disciplinary action against them, be at least twenty years old, and not be addicted to alcohol or any drugs that impair judgment or coordination).

[26] 63 P.S. § 422.51a provides: "A person who is not licensed under this section may not use the designation of licensed athletic trainer, athletic trainer or any of the listed abbreviations for that title, including 'L.A.T.' or 'A.T.L.,' or any similar designation." *Id.* § 422.51a(c). Similarly, 49 Pa. Code § 18.503 prohibits unlicensed individuals from using the title "athletic trainer" and from performing athletic training duties. 49 Pa. Code § 18.503(a)-(b). 63 P.S. § 422.38 states that the "practice, or attempt to offer to practice" any area or practice "requiring a license, certificate or registration from the board" without a valid license, certificate, or registration is unlawful, and, upon proof of unlawful practice, requires the court to enjoin the individual from continuing to practice. 63 P.S. § 422.38.

Pennsylvania and its citizens in the health and safety of student-athletes is particularly great when a college affirmatively purports to provide its athletes with care from certified athletic trainers while in fact allowing uncertified individuals to masquerade in performing athletic training duties. In such circumstances, an athlete's decision-making ability regarding his medical care and return to play not only is compromised by the aforementioned pressures, but also is impaired by his ignorance of the caregiver's lack of qualification to deliver advice.

Lackawanna College's conduct makes clear that the public's interest in protecting the health and safety of intercollegiate athletes cannot be entrusted categorically to colleges based upon the assumption that they will in all instances ensure that their athletic departments are staffed adequately to provide treatment to injured student-athletes. Judicial recognition of this duty is necessary to ensure that colleges take the necessary precautions to protect their athletes from injury by holding them accountable for failing to fulfill this obligation.

Because the public has a strong interest in protecting collegiate athletes from injury, and from receiving athletic training services from uncertified individuals, this factor also weighs in favor of imposing a duty.

### IV. Conclusion

Based upon this analysis of the *Althaus* factors, the better view of Pennsylvania law is that colleges and universities bear a duty to ensure that qualified medical personnel

---

Section 422.39 provides that "[a]ny person . . . who violates any provisions of this act or any rule or regulation of the board commits a misdemeanor in the third degree" and is subject to fines and imprisonment. *Id.* § 422.39. This section also allows the Board of Medicine to impose civil penalties in addition to any criminal penalties imposed. *Id.*

are available to student-athletes when the athletes participate in intercollegiate contact sports. Whether Lackawanna College breached this duty, and whether this breach caused Feleccia's and Resch's injuries, remain questions for the jury.[27] Thus, while I agree with the Majority to the extent that it concludes that Lackawanna College owed a duty to Feleccia and Resch in this case, I disagree with the Majority's choice to limit its holding to this case-specific evaluation of this school's particular representations and these parties' course of conduct. Unintentionally, but in practical effect, such limitation may create a perverse incentive for institutions like Lackawanna College to do less rather than more to protect their athletes by encouraging the institutions to make no representations at all.

---

[27] The Majority and the Chief Justice express somewhat differing views on the question of whether the availability of qualified medical personnel is satisfied by immediate telecommunication access or instead requires actual physical presence. *See* Maj. Op. at 18 n.8; Concurring and Dissenting Op. (Saylor, C.J.) at 2-3 n.1. While I agree that the former is satisfactory with respect to physician availability, I incline toward the view that the latter is required for licensed athletic trainers. Whether a game or practice is "at home" or "away," an on-campus presence of a licensed athletic trainer is a manifestly reasonable requirement. *See generally Amicus* Brief for NATA.